926 A.2d 199

**NADER FOR PRESIDENT 2004, et al.**

v.

**MARYLAND STATE BOARD OF ELECTIONS.**

**No. 76, Sept. Term, 2004.**

Court of Appeals of Maryland.

June 21, 2007.

682

Stephen Domenic Scavuzzo of Vienna, VA, for appellants.

Melissa Shane Whipkey, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, and William F. Brockman, Assistant Attorney General), of Baltimore, for appellant.

Argued before BELL, C.J., RAKER, WILNER,* CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

BELL, C.J.

This case involves the sufficiency of the petition, filed by the appellants, Nader for President 2004 and the Populist Party (collectively "Nader for President"), for the purpose of forming a new political party and nominating Ralph Nader as its candidate for President of the United States. The appellee, Maryland State Board of Elections ("the State Board"), acting pursuant to Maryland Code (2003) § 6–203 [1] of the Election

---

\* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Code (2003) § 6–203 of the Election Law Article provides, in relevant part:

\* \* \*

"(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

Law Article ("EL"), invalidated 5,631 of the 15,094 signatures that were affixed to the nominating petition. Because, as a result, the petition fell short of the requisite 10,000 signatures by 537 signatures, the State Board did not certify the new party and, consequently, Mr. Nader's name was not to be placed on the ballot in the 2004 Presidential Election. It was stipulated that 542 of the invalidated signatures were invalidated solely on the basis that the signers, who were registered voters in the State, were registered in a county other than the one specified on the sheets they signed; they signed the petition sheet for the "wrong county." *See* EL § 6–203(b)(2), *supra.* The sole issue presented, therefore, is whether, when the signatories are otherwise eligible to vote in this State, the State Board's invalidation of those 542 "wrong county" signatures was proper. We shall hold that Maryland Code (2003) § 6–203(b)(2) of the Election Law Article is invalid as applied in the case *sub judice.* Accordingly, the State Board improperly rejected the 542 petition signatures.

## I.

This Court has held that "the Maryland Constitution sets forth the *exclusive* qualifications and restrictions on the right to vote in the State of Maryland." *Maryland Green Party v.*

"(1) the requirements of subsection (a) of this section have been satisfied;
"*(2) the individual is a registered voter in the county specified on the signature page and, if applicable, in a particular geographic area of the county;*
"(3) the individual has not previously signed the same petition;
"(4) the signature is attested by an affidavit appearing on the page on which the signature appears;
"(5) the date accompanying the signature is not later than the date of the affidavit on the page; and
"(6) if applicable, the signature was affixed within the requisite period of time, as specified by law."

\* \* \*

(Emphasis added).

Although this Article has been revised with a cumulative supplement through 2006, unless otherwise stated, all statutory references are to the Election Law Article of Maryland Code (2003), the statute in effect when this case arose.

*Bd. of Elections,* 377 Md. 127, 152, 832 A.2d 214, 229 (2003). *See also State Admin. Bd. of Election v. Bd. of Supervisors of Elections of Baltimore City,* 342 Md. 586, 599, 679 A.2d. 96, 102 (1996) ("These prerequisites [Article I, §§ 1 and 4] are the exclusive qualifications for voting in Maryland"); *Jackson v. Norris,* 173 Md. 579, 595, 195 A. 576, 584 (1937) ("[T]he qualifications for the exercise of the elective franchise are [] prescribed by section 1 of article 1 of the Constitution. . . ."); *Kemp v. Owens,* 76 Md. 235, 239, 24 A. 606, 607 (1892) (Bryan, J., concurring) ("The qualifications of the voter are prescribed in the first article of the constitution").

 Article I, § 1 of the Constitution confers upon any citizen of the United States, age eighteen or older, who is a resident of the state of Maryland, and who is not disqualified pursuant to Article I, § 4, *infra,* the right to vote.[2] It provides:

> "All elections shall be by ballot. Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides at all elections to be held in this State. *A person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State.*"

(Emphasis added). This right also is embodied in Article 7 of the Maryland Declaration of Rights, which provides:

---

**2.** *See also* Maryland Code (2003) § 3–102(a) of the Election Law Article, which addresses the qualifications for voter registration, providing:

"(a) *In general.*—Except as provided in subsection (b) of this section, an individual may become registered to vote if the individual:

"(1) is a citizen of the United States;

"(2) is at least 18 years old or will be 18 years old on or before the day of the next succeeding general or special election;

"(3) is a resident of the county as of the day the individual seeks to register; and

"(4)registers pursuant to this title."

"That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and *every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage.*"

(Emphasis added). It is one of, if not, the most important and "fundamental right[s] granted to Maryland citizens as members of a free society." *Liddy v. Lamone,* 398 Md. 233, 253, 919 A.2d 1276, 1290 (2007); *Kemp,* 76 Md. at 241, 24 A. at 608 ("The elective franchise is the highest right of the citizen, and the spirit of our institutions requires that every opportunity should be afforded for its fair and free exercise").

As outlined in Article I, § 1, once an individual is entitled to vote in the election district where he or she resides, that individual remains entitled to vote in that district "until he [or she] shall have acquired a residence in another election district or ward...." As we explained in *Green Party,* "a qualified voter who moves from one residence to another *within* the same election district remains fully qualified [to vote in that district.] ... [A] qualified voter who may be in the process of moving *from one district into another* remains qualified to vote in his or her *original district* until the change in domicile is fully effective." 377 Md. at 141–42, 832 A.2d at 222 (emphasis added). This is to say, an individual's entitlement to vote is not extinguished merely based on a change in residence.[3]

Article I, § 2 of the Maryland Constitution mandates that the General Assembly provide "for a *uniform* Registration of the names of all voters in this State, *who possess the*

---

**3.** *See also* Maryland Code (2003) § 3–101(d) of the Election Law Article, pertaining to voter registration generally and providing:

"(d) *Registration to be permanent.*—A voter:

"(1) if registered in a county in the State, *shall remain registered* when the voter moves to another county in the State; and

"(2)may not be required to register again unless the voter's registration is canceled pursuant to Subtitle 5 of this title."

(Emphasis added).

*qualifications* prescribed in [Article I, §§ 1 and 4]," and that that Registration "shall be *conclusive evidence* . . . of the right of every person . . . to vote at *any* election thereafter held in this State."[4] (Emphasis added). Thus, Article I, § 2, imposes certain limitations on the General Assembly, and, in effect, the State Board, when it comes to the creation and management of the State's voter registry. Precisely, and pertinent to the case *sub judice*, the Legislature has "no discretion to decide who may or may not be listed [on the state's registry.]" *Green Party*, 377 Md. at 142–43, 832 A.2d at 223. In other words, the uniform, statewide registry is the official registry of who qualifies to vote in this State, and, thus, who qualifies to sign a nominating petition. Without affirmative proof that the individual is not a registered voter listed on the State registry, whether due to his or her failure to register or disqualification under Article I, § 4, the State Board is not permitted by law to disqualify any individual from exercising his or her right of suffrage.

▪ Finally, Article I, § 4 sets out the specific perimeters of the disqualification of an individual from the right to vote in Maryland.[5] Under the Constitution, there are only two instances in which an individual otherwise qualified to vote may

---

4. Article I § 2 of the Maryland Constitution provides:

"The General Assembly shall provide by law for a uniform Registration of the names of all the voters in this State, who possess the qualifications prescribed in this Article, which Registration shall be conclusive evidence to the Judges of Election of the right of every person, thus registered, to vote at any election thereafter held in this State; but no person shall vote, at any election, Federal or State, hereafter to be held in this State, or at any municipal election in the City of Baltimore, unless his name appears in the list of registered voters; the names of all persons shall be added to the list of qualified voters by the officers of Registration, who have the qualifications prescribed in the first section of this Article, and who are not disqualified under the provisions of the second and third sections thereof."

5. Article I § 4 of the Maryland Constitution provides:

"The General Assembly by law may regulate or prohibit the right to vote of a person convicted of infamous or other serious crime or under care or guardianship for mental disability."

be denied the right to vote: (1) if the person is "convicted of an infamous or other serious crime" or (2) if the person is "under care or guardianship for a mental disability." [6] The Constitution does not require, and, thus, does not allow for the disqualification of voters, otherwise qualified to vote, on any other basis. Although one is required to vote in his or her own election district or ward, one is not required to be registered on a specific, separate county list in order to be able to do so.

In order to become a statutorily-recognized political party in Maryland, a party must file a petition, on or before the first Monday in August of a presidential election year, that bears, *inter alia,* "the signatures of at least 10,000 registered voters who are eligible to vote in the State as of the first day of the month in which the petition is submitted." [7] The party's

---

6. *See also* Maryland Code (2003) § 3–102(b)(3) and (c), which add, respectively, that an individual may be disqualified to be a registered voter if he or she "has been convicted of buying or selling votes" or if "the individual has been convicted of a second or subsequent crime of violence, as defined in § 14–101 of the Criminal Law Article."

7. *See* Maryland Code (2003) § 4–102 of the Election Law Article, captioned "New political parties," which provides, as pertinent:

* * *

"(b) *Requirements of petition.*—(1) The petition shall state:

"(i) the partisan organization's intent to organize a State political party;

"(ii) the name of the partisan organization;

"(iii) the name and signature of the State chairman of the partisan organization; and

"(iv) the names and addresses of 25 registered voters, including the State chairman, who shall be designated as constituting the initial governing body of partisan organization.

"(2) (i) *Appended to the petition shall be papers bearing the signatures of at least 10,000 registered voters who are eligible to vote in the State as of the first day of the month in which the petition is submitted.*

"(ii) Signatures on the petition must have been affixed to the petition not more than 2 years before the filing date of the last qualifying signature.

"(c) *Filing of petition.*—(1) Except as provided in paragraph (2) of this subsection, a petition for the formation of a new political party, or any additional signatures to a petition, may be filed at any time.

"(2) A petition for the formation of a new political party, or any additional signatures to a petition, may be filed:

petition, moreover, must satisfy the general petition requirements of Title 6 of the Election Law Article.[8] For instance, pursuant to EL § 6–201(c)(3), each signature page is required to contain "a statement, to which each signer subscribes, that: (i) the signer supports the purpose of [the] petition process; and (ii) based on the signer's information and belief, the signer is a registered voter in the county specified on the page and is eligible to have his or her signature counted[.]" In addition, "a space for the name of the county in which each of the signers of that page is a registered voter" is required. EL § 6–201(c)(5). If the voter is not a registered voter in the county specified on the signature page that bears his or her signature, the State Board will not, pursuant to EL § 6–203(b)(2), validate or count the petition signature.

The State Board's validation and counting process begins with the receipt of a party's petition, including all signature sheets. The State Board disseminates the signature sheets to the appropriate corresponding local board of elections ("LBE") to be counted. Each LBE checks the signatures on the signature sheets against its list of registered county voters. If a name on a signature sheet is not on its list, the signature is invalidated. That is true regardless of whether

---

"(i) *in the year of an election at which the President is elected except:*
"1. during the period of time that registration is closed before and after a primary election in accordance with § 3–302(a) of this article; and
"2. *after the first Monday in August until registration reopens after the general election in accordance with § 3–302(a) of this article* [.]"

\* \* \*

(Emphasis added).

**8.** *See* Maryland Code (2003) § 4–102(a) of the Election Law Article, which provides:

"(a) *Formation.*—Any group of registered voters may form a new political party by:
"*(1) filing with the State Board on the prescribed form a petition meeting the requirements of subsection (b) of this section and of Title 6 of this article;* and
"(2) adopting and filing an interim constitution and bylaws in accordance with subsection (e) of this section."

(Emphasis added).

the name is on the list of another LBE or the person can be verified as being registered in another county. When the count is complete, each LBE completes a summary, containing the number of valid and invalid signatures, which is returned to the State Board. Each LBE also returns to the State Board, with the summary, copies of the signature pages, including any pertinent notations.[9]

Based on the summaries from the LBEs, the State Board determines the sufficiency of the petition, whether it should be certified. EL § 6–208(a)(1) prescribes, "[a]t the conclusion of the verification and counting processes, the chief election official of the election authority shall ... determine whether the validated signatures contained in the petition are sufficient to satisfy all requirements established by law relating to the number and geographical distribution of signatures." If it is determined that all legal requirements have been met, the election official shall "certify the sufficiency of the petition[.]" EL § 6–208(b)(2). If, however, the petition is determined to be deficient, for any reason, including but not limited to the lack of the requisite number of signatures, the election official shall "immediately notify the sponsor [of the petition] of that determination, including any specific deficiencies found." EL § 6–208(a)(2).

On August 2, 2004,[10] the Populist Party ("the Party") filed a petition seeking certification of its party, as well as of its presidential candidate. Affixed to the petition were signature sheets, broken down by county, purporting to contain the signatures of 14,991 registered voters.[11] The State Board

---

**9.** The record indicates that there were a number of notations made on the signature sheets. For instance, the letters "NR," standing for "not registered," were used for those signatures that were not found on the particular LBEs roll. In addition, the letter "D" was used to indicate a "duplicate" signature, *i.e.,* that the signature appeared more than once on signature sheets for the *same* county, not multiple counties.

**10.** August 2, 2004 was the first Monday in August and, thus, the deadline for submitting petitions to form a new political party.

**11.** The purported number of signatures was determined by the Party itself and was the number it reported to the State Board. The State

disseminated the signature pages to the applicable county boards for verification.[12] On August 23, 2004, in accordance with EL § 6–210,[13] the Director of the Election Management Division of the State Board ("the Director") notified the Party that 5,631 of its petition signatures had been invalidated.

On August 27, 2004, Nader for President filed an action, in the Circuit Court for Anne Arundel County, seeking, pursuant to EL §§ 6–209 and 6–210(e),[14] expedited judicial review of the

---

Board, however, determined later that 15,094 signatures were actually submitted and reviewed by the various county boards.

**12.** Dissemination of signature sheets to the county boards for verification is not prescribed by the Code. It is a procedure established by the State Board. *See* EL § 6–207(b), which provides that "[t]he State Board, by regulation, shall establish the process to be followed by all election authorities for verifying and counting signatures on petitions." *See also* Code of Maryland Regulations, sec. 33.06.05.01.A, *infra*.

**13.** Maryland Code (2003) § 6–210 of the Election Law Article captioned "Schedule of process," designates the time in which the State Board must act once a petition is filed. It provides, in pertinent part:
"(c) *Verification and counting.*—The verification and counting of validated signatures on a petition shall be completed within 20 days after the filing of the petition.
"(d) *Certification.*—Within 2 business days of the completion of the verification and counting processes, or, if judicial review is pending, within 2 business days after a final judicial decision, the appropriate election official shall make the certifications required by § 6–208 of this subtitle."

**14.** Maryland Code (2003) § 6–209 of the Election Law Article provides, as relevant:
"(a) *In general.*—(1) A person aggrieved by a determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle *may seek judicial review:*
"(i) in the case of a statewide petition, a petition to refer an enactment of the General Assembly pursuant to Article XVI of the Maryland Constitution, or a petition for a congressional or General Assembly candidacy, in the Circuit Court for Anne Arundel County; or
"(ii) as to any other petition, in the circuit court for the county in which *the petition is filed.*
"(2) The court may grant relief as it considers appropriate *to assure the integrity of the electoral process.*
"(3) *Judicial review shall be expedited by each court that hears the cause to the extent necessary in consideration of the deadlines established by law.*"
(Emphasis added).

State Board's determination and "declaratory judgment hold-
ing that more than 536 signatures invalidated by the Board
should have been counted and certified." In addition, the
appellants sought declaratory judgment that their "civil rights
[had] been violated[,]" $300,000 in damages, along with reason-
able attorney's fees, and "[s]uch other and further relief as the
case may require, including all court orders necessary to
ensure the integrity of the electoral process." The State
Board moved to dismiss the action, or in the alternative, for
summary judgment. At a pretrial conference on September 8,
2004, the appellants, plaintiffs below, abandoned their mone-
tary damages claim, and the parties stipulated that the single,
dispositive issue in the case was whether Nader for Presi-
dent's petition should have been certified as sufficient. On
that issue, the appellants asserted that the State Board was
required, under the Maryland Constitution, in the case of
registered voters, "to validate the signatures of individuals
that appeared on a signature page for a county other than the
county in which they were registered." The appellee coun-
tered, citing EL § 6–203(b)(2), which, as noted earlier, in its
application, provides for the disqualification of a signature if it
and the signer's address do not correspond, *i.e.* both are not
located in the county specified at the top of the petition
signature page.

A hearing was held in the Circuit Court on September 13,
2004. At the hearing, it was established that the State Board
had compiled a computerized list of all registered voters in the
State and that a disk with those individuals' names was

---

Maryland Code (2003) § 6–210(e) of the Election Law Article pro-
vides:
*"Judicial review.*—(1) Except as provided in paragraph (2) of this
subsection, any judicial review of a determination, as provided in
§ 6–209 of this subtitle, *shall be sought by the 10th day following the
determination to which it relates.*
"(2) If the petition seeks to place the name of an individual or a
question on the ballot at any election, judicial review shall be sought
by the day specified in paragraph (1) of this subsection or the 63rd
day preceding that election, whichever day is earlier."
(Emphasis added).

available to the public.[15] The computer disk, however, did not contain a "searchable database" of registered voters on a county-by-county basis and was not officially available to the LBEs. Instead, the information on the disk was made available to the LBEs on a state-sponsored "intranet," which they could access through computer terminals, using a software program, "Power Profile." Nonetheless, some LBEs did not have access to the software program because of budget constraints that prevented the State Board from providing such access to them.[16]

The appellants argued that the State Board's failure to use the statewide list of voters to verify the signatures on its petition was not rational. There was no reason, in the appellants' opinion, that the State Board should have allowed the LBEs to disqualify voters solely on the basis that they signed in the "wrong county" when the use of the database could have identified those individuals as registered voters in other counties in the State. The appellants contended, in addition, that the State Board's processes, as outlined in both the Election Law Article and the Code of Maryland Regulations ("COMAR"), were unconstitutional. In short, the appellants maintained that, under the system used by the State Board, voters

---

**15.** The State Board compiled this list in accordance with the federal Help America Vote Act of 2002, 42 U.S.C § 15301 *et seq.* Section 15483(a)(1)(A) of that Act, entitled "Computerized statewide voter registration list requirements and requirements for voters who register by mail," provides:

"(A) *In general.* Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, *a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State* and assigns a unique identifier to each legally registered voter in the State . . . ."

(Emphasis added). Moreover, § 15483(a)(1)(A)(viii) states that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."

**16.** At trial, testimony was offered that five counties did not use "Power Profile" at all because they had incompatible computers and software.

were disenfranchised, unreasonably and unnecessarily so.[17]

The appellee, the State Board, did not agree. The Director testified that the procedure in place, *i.e.* the dissemination of signature pages to the individual LBEs, was the most effective way to count the signatures, considering that some of the LBEs could not access the statewide voter list, not having use of the required computer software. Although the state database was an alternative means of verifying signatures, the Director made clear that its use was not prohibited by any law; it simply was not the most efficient way of counting the signatures and, thus, determining the sufficiency of the petition. The State Board's main argument, however, was that the use of the database could result in a single voter being "verified" more than once if that voter signed petitions in multiple counties and each county's LBE verified the name on the database as opposed to its own list. In sum, the State Board's argument was that in permitting the LBEs to certify only their own resident voters, potential issues, such as voter mistake and voter fraud, could be avoided.[18]

---

**17.** The appellants asserted further that the State Board's statutory scheme, in effect, created two separate classes that treated voters, who were both within the law, differently. Specifically, parties that filed petitions close to the filing deadline were not afforded the same opportunities for recourse, thus, having to bear the burden of filing their petitions early in anticipation of any problems that may arise. This, the appellants averred, caused many voters, whose signatures were ultimately discounted, to be disenfranchised.

**18.** It was stipulated at trial that the 542 disqualified signatures *did not* include any disqualifications for multiple signatures by the same voter. At oral argument in this Court, the nature of the stipulation that the 542 "wrong county" disqualified votes did not include any multiple signatures was raised. The State Board maintained that the stipulation was made only to facilitate an appeal to this Court and that it was more of an "academic," than factual, stipulation. The appellants' counsel, on the other hand, indicated that the stipulation was accurate and supported by the facts. Indeed, he said, it was the State Board that specified the number. The appellants' counsel said that Nader for President had come up with its own number (618) as to the "wrong county" disqualifications and that the State Board furnished, after researching the matter, the number at issue in the instant case. Nader for President stipulated to the State Board's number of fewer disqualifi-

The Circuit Court issued its order the following day, rejecting the appellants' arguments and declaring that the "county-match" requirement, set forth in EL § 6–203(b)(2) and COMAR sec. 33.06.05.01.A,[19] was constitutional and not violative of the appellants' rights. The court articulated the issue as being:

"Did defendant's rejection of signatures by registered voters, who signed plaintiffs' petition under the 'wrong' county heading, pursuant to Maryland Code, Election Law Art., sec. 6–203(b), violate the Maryland State Constitution?,"

and, answering that question in the negative, explained:

"[T]he state constitution itself provides restrictions upon registered voters' exercise of their franchise in a county other than that of their residence. Therefore, this Court finds that the Maryland General Assembly had a rational basis consistent with the state constitution to include this restriction in sec. 6–203 of the Election Law and that the State Board of Elections had a rational basis to include it in the petition verification system of COMAR, sec. 33.06.05.01.A. This restriction has the common sense benefit of preventing a voter from improper exercise of his or her franchise in more than one county for the same electoral purpose."

On the issue of the statewide database, the Circuit Court opined:

"When the applicable statutory provisions most recently were adopted, the State Election Board did not have the capacity to perform a timely, statewide computer database

---

cations because certification would be required whichever is the correct number.

**19.** Code of Maryland Regulations, sec. 33.06.05.01.A provides:

"Petitions Filed with State Board. For a petition filed with the State Board, *the State Administrator shall transmit to the election director of each county, for verification under this chapter, all of the signature pages that, in accordance with* COMAR 33.06.04.03, the sponsor designated as containing the names of individuals residing in that county."

(Emphasis added).

search of a list of registered voter. If the capacity now has been created, this should not cause the existing statutory provision instantly to become unconstitutional and force the State Election Board administratively to rewrite all petition verification procedures."

The Court added:

"The State of Maryland has a rational basis for establishing deadlines in relation to election filings, so as to avoid last-minute ballot chaos. Thus, the difficulty created by plaintiffs [appellants] for themselves through last-minute petition filings does not constitute a violation of their rights by the State."

Nader for President noted an appeal to the Court of Special Appeals. This Court, on its own motion, issued a writ of certiorari prior to any proceedings in that court. *Nader for President 2004 v. Maryland State Bd. of Elections*, 383 Md. 215, 858 A.2d 483 (2004). Oral argument was heard on September 20, 2004, and, on that same day, the Court issued its Order reversing the judgment of the Circuit Court and remanding the case to that court with directions to enter a judgment declaring EL § 6–203(b)(2) invalid. We now set forth the reasons for that Order.

## II.

■ It is a well settled principle that "a State Legislature may not enact laws that are in derogation of the Constitution." *Lamone v. Capozzi*, 396 Md. 53, 73, 912 A.2d 674, 685 (2006), citing *Bienkowski v. Brooks*, 386 Md. 516, 546, 873 A.2d 1122, 1140 (2005) ("[T]he constitutional authority to implement a constitutional provision ... does not authorize the General Assembly by statute or this Court by rule to contradict or amend the Constitution"); *Washabaugh v. Washabaugh*, 285 Md. 393, 411, 404 A.2d 1027, 1037 (1979) (noting that the constitutional authority to implement a constitutional provision, by rules, does not authorize a rule which is inconsistent with that provision, as it would be a "license ... to make a substantive change in the Maryland constitution ..., a result

we do not think was contemplated by the drafters. . . ."). *See, e.g., Williams v. Rhodes*, 393 U.S. 23, 29, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 29 (1968) ("[W]e must reject the notion that Art. II, § 1 [of the United States Constitution] gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other [state] constitutional provisions");[20] *Langhammer v. Munter*, 80 Md. 518, 527, 31 A. 300, 301–02 (1895) ("But whatever may be done, no restrictions can be imposed that will require other or different qualifications for voting, than those prescribed by the first Article of the Constitution of the State)"; *Kemp v. Owens, supra,* 76 Md. at 239, 24 A. at 607 (Bryan, J., concurring) ("We cannot add anything to the qualifications prescribed in the constitution; neither can we take anything from them"); *Southerland v. Norris*, 74 Md. 326, 328, 22 A. 137, 137 (1891) ("[Q]ualifications [for voting in Maryland], fixed by the organic law, can neither be enlarged nor curtailed by the General Assembly"). *See also* MD CONST. art III, § 49.[21]

Moreover, because this case involves the rights, and possible disenfranchisement, of hundreds of Maryland voters, this Court must examine, "in a realistic light[,] the extent and nature of [the] impact [of EL § 6–203(b)(2)] on [those] voters." *Maryland Green Party v. Bd. of Elections*, 377 Md. 127, 163,

---

**20.** Article II, § 1 of the United States Constitution expressly delegates to the States the authority to regulate the selection of Presidential electors, providing, as pertinent:

*"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors,* equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

(Emphasis added).

**21.** Article III, § 49 of the Maryland Constitution provides:

" § 49. Regulation of elections

"The General Assembly shall have power to regulate by Law, *not inconsistent with this Constitution,* all matters which relate to the Judges of election, time, place and manner of holding elections in this State, and of making returns thereof."

(Emphasis added).

832 A.2d 214, 235 (2003), *citing Bd. of Supervisors of Elections v. Goodsell,* 284 Md. 279, 288, 396 A.2d 1033, 1038 (1979), *quoting Henderson v. Fort Worth Indep. Sch. Dist.,* 526 F.2d 286, 291 (5th Cir.1976). This Court's decision in *Green Party* offers significant guidance as to the standard of review to be applied in the case *sub judice.* In that case, the petitioners, the Green Party, a minor political party, sought to nominate a candidate for the November 2000 election for the United States House of Representatives in Maryland's first congressional district. At the time, the State Board had set forth three methods for a political party to nominate its candidate— by primary, by convention, and by petition. The Green Party's options were limited to a double-petition requirement, it not being a "principal political party." 377 Md. at 137, 832 A.2d at 220. The petitioners sought declaratory relief, challenging, *inter alia,* the constitutionality of the statutory limitation on "inactive voters," *i.e.* the State Board's disqualification of the Green Party's nomination petition signatures based on voters being placed on an "inactive list." *Id.* We held such disqualification to be inconsistent with the Maryland Constitution. 377 Md. at 139, 832 A.2d at 221.

In *Green Party,* this Court recognized that laws that affect candidates, and the parties which nominate them, "always have at least some theoretical, correlative effect on voters." 377 Md. at 162, 832 A.2d at 235, *quoting Goodsell,* 284 Md. at 287, 396 A.2d at 1037. The Court acknowledged further that "the effect on voters [of potential candidates being precluded from running for office] is neither incidental nor remote ... voters are substantially limited in their choice of candidates. Because of this impact upon voter choice ... [the applicable statutory] requirements [are] subject to the same 'close scrutiny' test which is applicable to laws placing barriers upon the right to vote." 377 Md. at 163, 832 A.2d at 235, *quoting Goodsell,* 284 Md. at 287, 396 A.2d at 1037.

Converse to the Circuit Court's application of a "rational basis test" in the instant case, and the appellee's argument, relying on *Nader v. Connor,* 332 F.Supp.2d 982, 986 (W.D.Tex. 2004), *citing Anderson v. Celebrezze,* 460 U.S. 780, 788, 103

S.Ct. 1564, 1569, 75 L.Ed.2d 547, 557 (1983), that "not all restrictions imposed by the states on candidates' ballot access impose constitutionally suspect burdens on voters' rights to associate or choose among candidates[,]" and, that, moreover, its regulatory interest are satisfied because EL § 6–203(b)(2) is "reasonable" and "nondiscriminatory," *see Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245, 253 (1992) ("[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon ... [the] rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions"); *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557, we are of the opinion that the impact on both the voters in this State and on the Party to be recognized, and, thus, the presidential candidate it nominates, is substantial. Accordingly, in order for EL § 6–203(b)(2) to pass constitutional muster, it must "withstand a higher degree of scrutiny than the so-called 'rational basis test.'" *Green Party,* 377 Md. at 163, 832 A.2d at 235. Accordingly, the State Board must show that the "county-match" requirement in EL § 6–203(b)(2) is "reasonably necessary to the accomplishment of legitimate governmental objectives, ... or necessary to promote a *compelling* governmental interest. *Id., quoting Goodsell,* 284 Md. at 289, 396 A.2d at 1039 (emphasis in original). *See also Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063, 119 L.Ed.2d at 253 (noting that if a state's requirements severely restrict the rights of voters, then the statutory requirements may be upheld only if they are narrowly tailored to advance a compelling state interest); *Texas Indep. Party v. Kirk,* 84 F.3d 178, 182 (5th Cir.1996).

## III.

Indeed, there are a number of constitutional provisions with which the appellants allege EL § 6–203(b)(2) is inconsistent. To begin, the appellants cite Article 7 of the Maryland Declaration of Rights, *supra.* They proffer that it "has been held to be even more protective of rights of political participation than the provisions of the federal Constitution." *Green Party,* 377 Md. at 150, 832 A.2d at 228; *See also Munsell v. Hennegan,*

182 Md. 15, 22, 31 A.2d 640, 644 (1943) ("[E]lectors should have the fullest opportunity to vote for candidates of any political party, and while this right . . . may be restricted by the dictates of common sense, and by [other] considerations . . . such restrictions will not be upheld when they are destructive of freedom of choice by the voters"); *Jackson v. Norris, supra,* 173 Md. at 601, 195 A. at 587, *quoting People v. President, etc., of Wappingers Falls,* 144 N.Y. 616, 620, 39 N.E. 641, 642 (1895) ("[The] Constitution confers upon every citizen meeting the requirements specified therein the right to vote at elections for all offices that are elective by the people, and there is no power in the legislature to take away the right so conferred").

The appellants also assert that Article I, § 1 of the Maryland Constitution protects the elective franchise and that Article 24 of the Declaration of Rights, through its implied concept of equal protection, *see State Admin. Bd. of Election Laws v. Bd. of Supervisors of Elections, supra,* 342 Md. at 595 n. 6, 679 A.2d at 100 n. 6, and cases cited therein, limits the power of the legislature to interfere with voters' participation in elections. Captioned, "Due Process," Article 24 provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

More specifically, the appellants submit that EL § 6–203(b)(2) "imposes a far more restrictive definition of a qualified voter than the one contained in the Maryland Constitution because it only permits an individual to vote if his residence address agrees with the rolls of the Board of Elections." Relying on *Green Party,* the appellants posit that a voter, in order to exercise his or her right to vote, is only obligated to show up on election day at his or her domicile and that "the Maryland Constitution does not require anything more from [that] voter. . . ." 377 Md. at 143, 832 A.2d at 223. That the voter must ensure that his or her address corresponds with that of the State Board's rolls, in order for his or her

signature to be counted for purposes of the petition certification process is, according to the appellants, unduly burdensome not only to the voters, but to the Party's ability to collect the required signatures. Further, the appellants, citing *Anderson v. Celebrezze, supra,* assert that their collection of more than 10,000 signatures should be all that is required in a presidential campaign.

The appellee, on the other hand, claims that EL § 6–203(b)(2) is, as noted earlier, both reasonable and nondiscriminatory, and, further, is in accordance with the residency requirements embodied in the Constitution. It denies that "the General Assembly has [] imposed additional qualifications or restrictions upon the right to vote by requiring voters to sign petitions with reference to the county in which they are registered."[22] Moreover, the appellee asserts that it did exactly what was prescribed under EL § 6–203(b)(2) and that it was not required to do anything else. Once it is determined that a voter is not on the reviewing county's list, the LBE for that county is required to invalidate the signature. Identifying, either by the address itself or by using the statewide database, another county in which the subject signatory is registered to vote is not required, according to the appellee, and neither is the effort to do so. The appellee argues that EL § 6–203(b)(2)'s prohibition against counting the signatures of voters not registered in the county that corresponds with the signature sheet upon which the signature is found pre-

---

**22.** *See* MD CONST. art. I, § 1, *supra.* *See also* Article I, § 5 of the Maryland Constitution, which provides:

"It shall be the duty of the General Assembly to pass Laws to punish, with fine and imprisonment, any person, who shall remove into any election district, or precinct of any ward of the City of Baltimore, not for the purpose of acquiring a bona fide residence therein, but for the purpose of voting at an approaching election, or, who shall vote in any election district, or ward, in which he does not reside, (except in the case provided for in this Article,) or shall, at the same election, vote in more than one election district, or precinct, or shall vote, or offer to vote, in any name not his own, or in place of any other person of the same name, or shall vote in any county in which he does not reside."

vents the counting of a single signature more than once, and, even more important, prevents voter fraud.[23]

The appellants counter that the unconstitutionality of § 6-203(b)(2) "derives from the lack of notice and inability to cure the problem prior to the voter being disenfranchised." While acknowledging the State's interest in preventing voter fraud, the appellants contend that the signers of a petition are not afforded the same protections as are voters in a general election. They analogize the petition nomination process to the actual casting of a ballot in an election, noting that a voter whose address does not correspond with the State Board's roll is not refused the right to vote. Instead the voter is given the opportunity to cast a provisional ballot,[24] which is counted, if the address, and, thus, the right to vote, is later verified. The same procedural safeguard, the appellants insist, should be accorded the petition process, particularly since most of the LBEs have access to the statewide database which they could use to verify "wrong county" signatures.[25]

---

**23.** The appellee, in its brief, gives an example of what could possibly occur if LBE's were permitted to use the state database instead of their own individual lists. According to the appellee, "if a registered voter signed a petition for each of the 24 counties, his or his signature would, under § 6-203, only be validated by the board of the county in which the voter resides. If [appellants'] scheme was adopted, the same registered voter's signature could be counted again by every LBE with adequate access to the State database."

**24.** *See* Maryland Code (2003) §§ 9-401 to 9-408 of the Election Law Article for provisional ballots.

**25.** The appellants also argued in their brief that:
"The Circuit Court's final paragraph demonstrated that 6-203(b) is also invalid on equal protection grounds. If the plaintiffs [appellants] had submitted the petition on June 2nd (in lieu of August 2nd), so the argument goes, there would have been time to submit additional signatures. Although it ignores the disenfranchisement of the voters who signed the wrong county sheet, the reasoning would have permitted the campaign to go out and obtain more signatures. That would create different rights for petitions submitted on the different dates, although both were timely."
As stated earlier in this opinion, the sole issue in the case *sub judice* is whether the 542 voters' signatures were invalidated improperly under EL § 6-203. We, thus, do not reach appellants' equal protection

The appellee, as did the Circuit Court, rejects the argument made by the appellants that the statewide database should have been used, simply because it was available. When the predecessor to EL § 6–203,[26] was adopted, it points out, no statewide database was in existence which would have permitted the State Board to perform a timely, statewide search of a list of registered voters. Therefore, the appellee submits, this technological advance, making it possible to verify signatures in a manner other than that prescribed in COMAR sec. 33.06.05.01.A, *supra,* should not result in the invalidation of that procedure. And its present existence does not render the pre-existing procedure unreasonable. Adopting the Circuit Court's reasoning and citing potential problems the use of the statewide database could cause, given its condition at the time, the different software that was used by the various boards, and the availability, or lack, of computer terminals at different LBEs, the State Board argued that use of the statewide database would be unworkable.

## IV.

With the pertinent constitutional provisions in mind, we turn now to the specific arguments of the parties. To begin, it is important to note that this Court has indeed equated the nominating petition process to voting in this State. In *Green Party,* we recognized that "if the only method left open for the members of a political party to choose their candidates is via petition, then the right to have one's signature counted on a nominating petition is integral to

---

argument pertaining to the State Board's nominating petition submission deadline.

**26.** EL § 6–203's predecessor can be found in Maryland Code (1957, 1993 Repl.Vol.), Article 33, § 7–1, as enacted in Chapter 555 of the Laws of Maryland 1969, which provided:

"Any paper which is to form a part of a certificate of candidacy shall be submitted to the Board for the County or the City of Baltimore in which the signers on the paper are alleged to reside ... It shall be the duty of the several boards in the jurisdiction in which the signer are alleged to be registered voters to verify the number of legitimate signatures on persons who are registered voters...."

that political party member's right of suffrage." 377 Md. at 151, 832 A.2d at 228. In the case *sub judice,* as noted earlier, Nader for President was *required* to complete the nominating petition process in order both to become a statutorily-recognized political party and to nominate its candidate for the presidency of the United States. We agree with the appellants that the same procedural safeguards should have been afforded to them that were, and continue to be, afforded to voters who cast ballots in an election.

■ The State Board, as did the Circuit Court, erroneously relies on Article I, § 1 of the Constitution. It analogizes that provision's proscription of voting outside of the voter's district to a voter signing a petition in the "wrong county." Based on that analogy, it asserts that no additional qualification or restrictions were imposed on voters. To be sure, the voters disqualified by the LBEs, and, thus, the State Board, were *qualified* registered voters in this State.[27] The procedure for certifying the petition, stripped those qualified, registered voters of their right to be counted as valid petition signers by disqualifying their signatures merely because the signatures were on a petition for a county in which they were not registered, a "wrong county" sheet. An individual who signs a party's petition, regardless of whether the signature was on the correct "county" sheet, enjoys the same protections of his or her right to suffrage under the Maryland Constitution as any voter casting a ballot on election day. Just as an individual is protected under the Constitution from having his or her right to suffrage restricted by burdensome statutes, one who signs a petition in support of a candidate, should not find "his or her right to take part in the nomination process curtailed." *Id.* The State Board, in effect, imposed an additional requirement on petition signers by requiring them, for their signatures to be validated, to be registered in the county whose petition they signed, in addition to appearing on the official statewide list of registered voters. Thus, the State Board, through its validation and counting processes, improperly

---

27. *See* MD CONST. art. I, § 4, *supra.*

invalidated the "wrong county" signatures of 542 otherwise qualified voters. As a result, those voters' right of suffrage was infringed upon.

We also agree with the appellants that the "county-match" requirement is unduly burdensome to the signers of the petitions, as well as to the Party itself. This is particularly so where a presidential campaign is involved. As the Supreme Court of the United States recognized in *Anderson v. Celebrezze*, a "[s]tate has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." 460 U.S. 780, 795, 103 S.Ct. 1564, 1573, 75 L.Ed.2d 547, 561 (1983). In that case, the Supreme Court held unconstitutional a statute requiring an independent candidate for the office of the President of the United States to file nominating petitions early in order to appear on the general election ballot. 460 U.S. at 786, 103 S.Ct. at 1568, 75 L.Ed.2d at 556. The *Anderson* Court noted that such a requirement burdened the voting and associational rights of the supporters of the candidate. 460 U.S. at 806, 103 S.Ct. at 1579, 75 L.Ed.2d at 569.

Similarly, in the case *sub judice*, the "county-match" requirement was not necessary. The nominating petition was for a statewide office, and, thus, the specific county in which a voter was registered was irrelevant. The appellants are correct when they assert that the fact that they obtained the required number of Maryland voters' signatures, 10,000, entitled them to have their petition certified.

In the same vein, we conclude that the State Board's literal, narrow reading of EL § 6–203(b)(2) is troublesome. As stated earlier, the State Board posits that the LBEs were not required to do anything other that what they did—invalidate any signatures that were not on their rolls. This Court rejects the State Board's approach. It is clear that the verification of the 542 disqualified signatures was not particularly burdensome for the State Board when contrasted with the effect that invalidation of those signatures could have, and

consequently did have, on the appellants. Those 542 signatures were determinative; without them, the appellants were unable to be certified and recognized as a political party and was not able to nominate a candidate to be placed on the general election ballot. Moreover, that the State Board was able to determine that the 542 signatures at issue were not duplicates does not help its argument. It, in fact, only proves that what the State Board contended was "unworkable" at oral argument, was very possible.

Even if this Court assumes, *arguendo,* as the appellee would urge us to do, that the use of the statewide database was unworkable or problematic, what would have stopped one LBE from notifying another LBE of an obvious wrong signature? That is to say, if a voter signed the petition signature sheet for Baltimore County, for whatever reason, but his or her address was clearly in Harford County, why could the incorrect LBE not contact the correct LBE in order to verify the signature? This would have allowed the correct LBE to check its records and determine not only whether the individual was, in fact, a resident of that county, but also whether that individual's signature had already been counted for purposes of the nominating petition.

Moreover, the State Board's processes did not allow for any checks or balances once the petitions were sent to the LBEs. The State Board did not, in any way, monitor what the LBEs did, relying solely on the summaries that the LBEs sent back when their counting was done. Although the State Board received copies of the signatures sheets with the various notations on them, it admitted to relying only on the summaries. There was, then, no way for the State Board to know if the LBEs had made any errors.

The State Board's argument that the availability of the state database should not render EL § 6–203(b)(2) unconstitutional is likewise unavailing. It is not disputed that, when certain provisions of the Election Law Article were adopted, a statewide database was not available to check for registered voters and that the database was a fairly new development at the

time of the case *sub judice.* The fact is, however, that the statewide database was a resource that the State Board could have used, and obviously did use to verify the 542 signatures as belonging to Maryland voters, albeit in counties other than the one whose petition they signed. It should have been used to prevent the disenfranchisement of hundreds of voters. Indeed, this Court has held in *Norris v. Mayor & City Council of Baltimore,* 172 Md. 667, 675, 192 A. 531, 535 (1937), that:

> "[W]hile the principles of the constitution are unchangeable, in interpreting the language by which they are expressed, it will be given a meaning which will permit the application of those principles *to changes in the economic, social, and political life of the people, which the framers did not and could not foresee."*

(Emphasis added). *See also Benson v. State,* 389 Md. 615, 632, 887 A.2d 525, 535 (2005); *Boyer v. Thurston,* 247 Md. 279, 292, 231 A.2d 50, 57 (1967); *Johns Hopkins University v. Williams,* 199 Md. 382, 386, 86 A.2d 892, 894 (1952).

In *Norris,* we examined the language of Article I, § 1, as we do in the instant case, although for a different purpose. In that case, the constitutionality of the provision that "[a]ll elections shall be held by ballot" was challenged by opponents of the use of voting machines. The opponents argued that the use of voting machines conflicted with Article I, § 1 because the term "ballot" could not include voting machines, as such machines did not exist at the time of Article I, § 1's adoption. *Norris* is analogous. In the case *sub judice,* the statewide database was an improvement in technology, as were the voting machines in *Norris,* that, in effect, facilitated the voting process. It replaced an aspect of the nominating petition process, *i.e.* the State Board's validation and counting procedures, while leaving the overall scheme intact. The use of the statewide database is consistent with Article I, § 2 of the Constitution which calls for a uniform system of voter registry, while, it at the same time, satisfies the interests of the State Board. Unlike the "county-match" requirement, the statewide database did not in any way change the overall

scheme of the nominating petition process as it only served as an alternative, and in the instant case a more effective, method by which the State Board could verify signatures.

To be sure, we do not deny that the State Board's interest in the case *sub judice* is compelling. It is clear that in order for there to be a fair and honest implementation of the elective franchise, regulations must be in place. Those regulations, however, cannot, as previously stated, be inconsistent with the protections afforded under the Constitution. It is evident that the State Board's "county-match" requirement, as prescribed by EL § 6–203(b)(2), cannot be squared with the constitutional provisions on voter qualification and registration. Specifically, there is no provision in the Constitution requiring, for purposes of the petition process, the signers of petitions to be broken down by county, failing which the signatories are disqualified. Therefore, the disenfranchisement of voters solely based on a "county-match" requirement is inconsistent with Article I of the Maryland Constitution, as well as with Articles 7 and 24 of the Maryland Declaration of Rights.

It is for the foregoing reasons that we reversed the judgment of the Circuit Court.

RAKER, HARRELL and GREENE, JJ., Dissent.

RAKER, J., dissenting, HARRELL, J. and GREENE, J., joining:

I respectfully dissent. I would affirm the judgment of the Circuit Court for Anne Arundel County, holding that "sec. 6–203 of the Election Law and COMAR, sec. 33.06.05.01.A do not violate state constitutional provisions or otherwise violate plaintiffs' civil rights." [1]

The question presented to this Court is as follows:

---

1. It appears as though the Circuit Court based its decision also upon the doctrine of laches. In holding that § 6–203 was constitutional, the Circuit Court went on to state as follows:

"The procedural problems created by 'wrong county' signatures were problems which could have been cured by advance determinations as

"Is section 6–203 of the State Election Law Article uncon-stitutional because it requires that a petition for party certification be signed by voters registered in the county specified on the signature page?"

The Maryland State Board of Elections ("SBE") argues that SBE followed the clear mandate of the Legislature in refusing to validate the signatures of voters who signed signature pages for counties in which they were not registered voters. SBE maintains that § 6–203 unambiguously provides that SBE may count only the signature of voters who are regis-tered to vote in the county specified on the applicable signa-ture page, and that for Nader for President to prevail, it must show that § 6–203 of the Election Law Article is unconstitu-tional.

I agree with SBE's position that § 6–203 is reasonable, nondiscriminatory, and accomplishes a legitimate governmen-tal objective. The asserted purpose underlying the statutory requirement prohibiting the counting of signatures of voters who are not registered in the county is to prevent counting a single voter's signature more than once. SBE explains as follows:

"For example, if a registered voter signed a petition for each of the 24 counties, his or her signature would, under § 6–203, only be validated by the board of the county in which the voter resides. If Nader for President's scheme was adopted, the same registered voter's signature could be counted again by every LBE with adequate access to the State database. Preventing the real possibility of multiple counting and voter or petition gatherer fraud is

to the petitions, if plaintiffs requested this earlier (Md.Code, Election Law Art., sec. 6–202), or by supplemental petitions, if plaintiffs arranged such filings earlier (*Id.,* sec.6–205). The State of Maryland has a rational basis for establishing deadlines in relation to election filings, so as to avoid last-minute ballot chaos. Thus, the difficulty created by plaintiffs for themselves through last-minute petition fil-ings does not constitute a violation of their rights by the State." Because the Maryland State Board of Elections did not argue laches before this Court, I will not address it.

an important regulatory interest that justifies the incidental limitation imposed by § 6–203."

As the Circuit Court noted, the availability of a state-wide database should not cause the existing statutory provision instantly to become unconstitutional and to force SBE to administratively rewrite all petition verification procedures. The remedy is with the Legislature, not a declaration from this Court that the statute is unconstitutional.

Accordingly, I would affirm the judgment of the Circuit Court for Anne Arundel County.

Judge HARRELL and Judge GREENE have authorized me to state that they join in this dissenting opinion.