*Linda H. Lamone v. Nancy Lewin, et al.*
No. 85, September Term 2017


**Election Law – Primary Elections – Ballots – Withdrawal or Disqualification of Candidate.**  The State election law provides that the name of a person who has filed a timely certificate of candidacy for a primary election "shall appear" on the ballot for that election.  The only exceptions are if the candidate files a timely certificate of withdrawal by the statutory deadline or if the election board learns, by another statutory deadline, that the candidate has died or become disqualified.  Otherwise, the name of the candidate "shall remain" on the ballot.  These directives concerning the content of the ballot are mandatory, even if it is anticipated that the candidate will become disqualified in the future or if the candidate arranges to become disqualified, after the statutory deadlines, by rescinding the candidate's voter registration.  Maryland Code, Election Law Article, §§5-504(b), 5-601.

**Election Law – Primary Elections – Ballots – Withdrawal or Disqualification of Candidate – Constitutionality.**  The provisions of the State election law governing the appearance of candidates on the primary election ballot, which state, respectively, that a candidate's name "shall appear" and "shall remain" on the ballot unless the candidate withdraws in a timely manner, or the election board learns of the candidate's death or disqualification by a statutory deadline, are constitutional.

Circuit Court for Anne Arundel County
Case No. C-02-CV-18-001013
Argument: May 2, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 85
September Term, 2017

_____

LINDA H. LAMONE

V.

NANCY LEWIN, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.
Getty, J., concurs;
Watts and Hotten, JJ., dissent.

_____

Filed: July 31, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Under Maryland law, the State Board of Elections ("State Board") and the local election boards have the often formidable task of conducting elections fairly, efficiently, and even-handedly. To that end, the General Assembly has directed the State Board "to ensure compliance with the requirements of [the Election Law Article]" and any federal law relating to the election process.[1] This case raises the question whether the State Board has discretion to deviate from the directives of the Election Law Article concerning the content of a primary election ballot and whether its adherence to those directives violated the State and federal constitutions.

Nathaniel Oaks, a longtime State legislator, filed a timely certificate of candidacy for the 2018 primary election for the State Senate seat that he held and for a position on his party's central committee. Before the primary, but after the deadlines for withdrawal of his candidacy and removal of his name from the ballot, he pled guilty to two felonies in federal court. The guilty plea itself did not disqualify him from holding office, but service of a prison sentence for those offenses would. After the State Board included his name on the certified primary election ballot in accordance with the relevant provisions of the Election Law Article, Appellees Nancy Lewin, Elinor Mitchell, and Christopher Ervin – two of whom were rival candidates for the central committee – filed this suit against Appellant Linda Lamone in her official capacity as State Administrator of Elections to have Mr. Oaks' name removed from the ballot.

---

[1] Maryland Code, Election Law Article ("EL"), §2-102(a); *see also* EL §2-202(b)(1) (local election boards to conduct elections in accordance with the Election Law Article and State Board regulations "in an open, convenient, and impartial manner").

The Appellees later filed a motion for an injunction to compel the State Board to remove Mr. Oaks' name from the ballot on the ground that he would likely receive a prison sentence that would render him disqualified before the general election. The Circuit Court declined to grant the injunction, on the basis that Mr. Oaks' disqualification from office, though likely, was not yet certain. Shortly thereafter, Mr. Oaks gave up his voter registration, rendering him disqualified for office because he was not a registered voter. The Circuit Court then issued the requested injunction, ordering the State Board to remove Mr. Oaks' name from the primary election ballot, despite the fact that such an action was contrary to the Election Law Article.

The State Board appealed. We reversed the Circuit Court in a *per curiam* order. We now state our reasons for that decision.

# I

# Background

## A. *State Election Law – Candidacy in a Primary Election*

*Eligibility*

A minimum requirement for eligibility to serve in any office created pursuant to the Maryland Constitution – such as State Senator – is that one must be a registered voter on the date of election and throughout the entire term of service. Maryland Constitution, Article I, §12. Similarly, to be a candidate for an office of a political party or to be a nominee of that party one must be a registered voter affiliated with that party. Maryland

2

Code, Election Law Article ("EL") §5-203(a)(2).[2]  An individual who has been convicted

of a felony and is serving a sentence of imprisonment for that conviction is not qualified to

be a registered voter.  EL §3-102(b)(1).  Thus, during such imprisonment, that individual

may not hold public or party office in Maryland.

*Deadlines for Candidates in Primary Elections*

The Election Law Article sets certain deadlines for a candidate to appear on the

ballot in a primary election.  There are three deadlines relevant to this case.

First, one must file a certificate of candidacy by "the last Tuesday in February in the

year which the primary election will be held."  EL §5-303(a)(1).[3]    For the 2018 primary

election, that deadline was February 27, 2018.

Second, if a candidate has a change of heart and no longer wants to run in the

primary election, the candidate must file a certificate of withdrawal within two days after

the deadline for filing a certificate of candidacy.  EL §5-502(a).  If the candidate withdraws

by the statutory deadline, the previously-filed certificate of candidacy is void and the

person's name is not to appear on the ballot.  EL §5-504(a).  For the 2018 primary election,

the withdrawal deadline was March 1, 2018.

Third, if a person has filed a timely certificate of candidacy, but the pertinent board

of elections learns, by the 10th day after the deadline for filing that certificate, that the

---

[2] There are exceptions not relevant to this case.

[3] This deadline applies to primaries in years involving a gubernatorial election, such as 2018.  EL §5-303(a)(1).

3

person has died or become disqualified for office, the person's name is not to appear on the ballot. EL §5-504(b); EL §5-601(l)(ii). For the 2018 primary election, that deadline fell on March 9, 2018.

If a person has filed a timely certificate of candidacy, but has not filed a timely certificate of withdrawal, or died or become disqualified (to the knowledge of the board of elections) by the statutory deadline, the name of the candidate "shall appear on the primary election ballot." EL §5-504(b); *see also* EL §5-601 (the name of the candidate "shall remain on the ballot and be submitted to the voters"). If a candidate in a primary election garners the most votes as a party's nominee in the primary election but wishes to decline the nomination or dies or becomes disqualified for the office, the party is to choose a successor nominee according to the Election Law Article. EL §§5-801, 5-1001 *et seq*.[4]

*Deadline for Ballot Certification and Overseas Ballots*

The State Board is to certify the content and arrangement of the ballots for a primary election at least 55 days before the election. EL §9-207(a)(1). Because different candidates stand for various offices in different districts and localities, there are multiple versions of the primary election ballot – referred to as "ballot styles" – that correspond to the various permutations pertinent to particular geographical areas. According to the State Board, there were 747 different ballot styles related to the 2018 primary election.

---

[4] There are separate provisions concerning vacancies related to candidates for Governor and Lieutenant Governor.

Within 24 hours after certification, the State Board is to publicly display the content and arrangement of the ballots on its website. EL §9-207(c). Unless a court orders otherwise, the content and arrangement of the ballot may not be changed after the second day of public display and the State Board may begin printing ballots. EL §9-207(d)-(e).

These deadlines are specified to ensure that the State Board has time to comply with federal law that requires that absentee ballots be available to military and overseas voters at least 45 days before the election. Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §20302(a)(8)(A). For the 2018 primary election, that deadline was May 12, 2018.

**B.** **_Candidacy in the 2018 Primary Election_**

_Generally_

According to statistics compiled by the State Board, it received 2,563 certificates of candidacy for the 2018 primary election by the February 27 deadline and 77 certificates of withdrawal by the March 1 deadline. The State Board became aware of the death or disqualification of eight candidates by the March 9 deadline and removed their names from the ballot. The State Board received approximately 10 requests from candidates to withdraw after the statutory deadline, which were all rejected on grounds of lateness.

_Mr. Oaks, his Candidacy, and his Criminal Prosecution_

Mr. Oaks had served as a member of the House of Delegates for nearly 30 years when he was appointed to fill a vacancy in the State Senate for Legislative District 41 on February 10, 2017. *See* https://msa.maryland.gov/msa/mdmanual/05sen/former/html/msa12285.html (last visited July 18, 2018).

5

On April 7, 2017, Mr. Oaks was initially charged in a criminal complaint in the United States District Court for the District of Maryland with wire fraud, a felony under the federal criminal law. *United States v. Oaks*, No. 1:17-CR-00288-RDB (D. Md.). On May 31, 2017, a federal grand jury superseded that complaint by returning an indictment comprised of nine felony counts. The charges all related to "corrupt use of his office in a bribery scheme." *See United States v. Oaks*, 302 F.Supp.3d 716, 718 (D. Md. 2018). Mr. Oaks pled not guilty to the charges; pretrial motions challenging the indictment were filed and litigated on his behalf. *Id*.

The filing of the criminal charges alone did not disqualify Mr. Oaks as a registered voter, as a candidate for office, or, for that matter, as an incumbent office holder. As indicated above, he would be disqualified in all three respects if and when he was convicted and imprisoned with respect to those charges.

While the criminal charges remained pending against him, Mr. Oaks filed a timely certificate of candidacy for the State Senate seat that he held, as well as for the Democratic Central Committee for District 41 in Baltimore City. Mr. Oaks did not withdraw his candidacy by the March 1, 2018 deadline. Nor had the State Board learned of anything by the March 9, 2018 deadline that disqualified Mr. Oaks as a candidate, as indeed he was not disqualified as of that date. Accordingly, under the State election law, his name was to appear on the primary election ballot.

On March 29, 2018, Mr. Oaks pled guilty, pursuant to a plea agreement, to two counts in the federal criminal case. The maximum penalty for both of the offenses to which he pled guilty included 20 years imprisonment. Sentencing was scheduled for July 17,

6

2018. Like the indictment, the guilty plea itself did not disqualify Mr. Oaks from being a registered voter, from being a candidate for office, or from holding office. He would become disqualified in all three respects if and when he were to serve a sentence of imprisonment as a result of that plea. On the same day that he pled guilty, Mr. Oaks resigned from his State Senate seat.

*Certification of 2018 Primary Ballots*

The State Board certified the primary election ballots on April 3, 2018 and, in accordance with the statute, posted them on its website the next day. Because Mr. Oaks had not filed a certificate of withdrawal nor become disqualified as a voter or candidate (even as of the date of his resignation from the Senate), the State Board included his name as a candidate for the State Senate and Democratic Central Committee on the pertinent primary election ballots that it certified.

## C. *Legal Proceedings*

*Complaint*

On April 9, 2018, almost a week after the ballots for the primary election had been certified, the Appellees filed this action in the Circuit Court for Anne Arundel County against Ms. Lamone in her official capacity as State Administrator of Elections. The Appellees were all registered voters in District 41; both Ms. Mitchell and Mr. Ervin were candidates for the Democratic State Central Committee for that district.

The complaint alleged that the State Board was allowing "the name of a person who will be disqualified" from the general election and from serving as State Senator to remain on the primary election ballot. Having Mr. Oaks' name on the ballot, the complaint alleged,

7

would confuse voters, cause voters to mistakenly vote for Mr. Oaks despite his anticipated disqualification, and violate the federal and state constitutional rights of the voters within the district. The complaint asked the court to compel the State Board to remove Mr. Oaks' name from the primary election ballot.

The Appellees brought their lawsuit under EL §12-202. Under that statute, a registered voter may seek judicial relief from a State Board action or omission relating to an election on the grounds that the act or omission is "inconsistent" with applicable election laws and "may change … the outcome of the election." EL §12-202(a)(1)-(2).[5] Prior to an election, suit must be filed within 10 days after the act or omission allegedly inconsistent with the election law – or within 10 days after the act or omission became known to the plaintiff. EL §12-202(b)(1). The complaint also asked the court to issue a writ of mandamus against the State Board, and sought declaratory and injunctive relief.

*Denial of Motion for TRO or Preliminary Injunction*

One week after the complaint was filed, the Appellees filed an amended complaint and a motion for a temporary restraining order ("TRO") and a preliminary injunction directing the State Board to take Mr. Oaks' name off the ballot. In that motion, they argued that the election law deadlines for removing names from the ballot are directory rather than mandatory, that the State Board therefore had discretion to remove Mr. Oaks' name, and that its failure to do so was arbitrary and capricious. Alternatively, the Appellees asserted

---

[5] The cause of action provided by this section is limited to circumstances where "no other timely and adequate remedy" is available under the Election Law Article. EL §12-202(a).

8

that, if the provisions of the Election Law Article are mandatory, the statute was unconstitutional as applied in this instance.[6]  The Circuit Court denied the motion for a TRO and scheduled a hearing concerning the request for a preliminary injunction.

On Friday, April 20, the Circuit Court held a hearing on the motion for a preliminary injunction.  At the hearing, the State Board argued that it had no discretion to remove Mr. Oaks' name from the ballot in light of the statutory deadlines for doing so.  It also presented evidence that, in any event, it would be difficult to remove Mr. Oaks' name from the ballot, even if it was legally permissible to do so.  Natasha Walker, the Project Manager of Election Management Systems for the State Board, who was responsible for coordinating the layout and printing of ballots, submitted an affidavit and testified at the hearing about the process of preparing the ballots for the primary elections.  She stated that creation of the 747 different ballot styles in various formats (*e.g*., specimen ballots, election day ballots, absentee ballots, audio ballots, etc.) required eight days.  An additional week was needed for a local election board in a larger jurisdiction such as Baltimore City to verify that the ballot styles aligned correctly with precincts.  According to Ms. Walker, Mr. Oaks appeared on two of the ballot styles, which were assigned to 50 election precincts and seven early voting centers.  Any change to a ballot would necessitate restarting the process and

___

[6] Attached to the amended complaint and motion was a copy of an affidavit of Mr. Oaks filed in another case challenging his appearance on the ballot.  *See Harpool v. Baltimore City Board of Elections, et al*., No. C-02-CV-18-001020 (Cir. Ct. Anne Arundel Co.).  In the affidavit, Mr. Oaks consented to the removal of his name from the primary election ballot.  We were advised at oral argument that the *Harpool* case had become dormant in light of the developments in this case.

result in a delay of at least a week. She stated that ballot preparation was complete and that printing was to begin on the Monday after the Friday hearing and was expected to take approximately three weeks. As of the date of the hearing, she stated it would be "doable" but "very challenging" to make any changes in the ballots.

The Circuit Court denied preliminary injunctive relief. The court reasoned that, while it was "virtually certain" that the sentence that Mr. Oaks ultimately would receive in the federal criminal case would disqualify him in the future from participating in the general election, he was not yet disqualified and that his future disqualification remained "legally speculative." Accordingly, it was not a basis for granting a preliminary injunction. The court did not express an opinion on whether EL §5-504(b) and §5-601 are mandatory or directory or on the constitutionality of those provisions.

*Mr. Oaks Withdraws his Voter Registration*

The following Monday, April 23, 2018, the State Board began printing the primary election ballots. That same day, Mr. Oaks withdrew his Maryland voter registration at the behest of the Appellees. In his letter to the local election board he stated that he was doing so "[t]o facilitate removal of my name from election ballot."

*Circuit Court Grants Preliminary Injunction*

In light of the fact that Mr. Oaks had relinquished his voter registration to disqualify himself from office, the Appellees filed a second amended complaint and asked the Circuit Court to reconsider their request for a preliminary injunction. The State Board filed an opposition, including a supplemental affidavit of Ms. Walker stating that ballot printing

10

had already begun and that, for a variety of reasons that she detailed, making changes to ballots at that stage was "not feasible."

On April 26, 2018, without holding a hearing, the Circuit Court granted the preliminary injunction. It ordered the State Board to "immediately remove" Mr. Oaks' name from "any and all ballots for elective office." In its two-page order, the Circuit Court noted that Mr. Oaks had disqualified himself as a candidate by virtue of his voluntary removal from the voter registration rolls. As a consequence, the court reasoned, "the harm to the voters by way of potential confusion, inadvertence, and/or mischief by the appearance of a disqualified name on the ballot far outweighs any inconvenience to the Board of Elections." The court also concluded that there was "no less comprehensive remedy" other than taking Mr. Oaks' name off of the ballot to make sure "that the voters' rights to effectively exercise their franchise will be protected."

In the order, the Circuit Court stated that it believed that there was sufficient time before the primary election for the State Board to revise the primary election ballots, and that any work on the ballots that the State Board had done between the denial of a preliminary injunction on April 20, 2018, and the grant of the motion on April 26, 2018, had been done with notice that the "matter remained in active litigation." As a result, the court said, the State Board could not claim that its position had been prejudiced. The court further concluded that the Appellees were likely to prevail on the merits of their claim, although it did not provide any analysis of the legal issues. Finally, the court found that

11

the balance of convenience favored the Appellees and that the public interest would be served by issuance of the injunction.[7]

The State Board immediately filed a notice of appeal and a petition for a writ of *certiorari* in this Court pursuant to EL §12-203(a)(3). On April 27, 2018, we granted *certiorari* and stayed the preliminary injunction issued by the Circuit Court pending further review.

Following expedited briefing, and oral argument on May 2, 2018,[8] we issued a *per curiam* order that vacated the preliminary injunction and remanded the case to the Circuit Court with direction to dismiss the complaint.

### D. *Epilogue*

In the interest of completeness, we take judicial notice of several events related to this case that occurred following the issuance of our *per curiam* order, but that do not affect our legal analysis in this opinion.

Approximately one month after we issued our order, Mr. Oaks apparently re-registered to vote on June 5, 2018. *See* Erin Cox, *Former Baltimore Sen. Oaks Re-Registers to Vote, Making Him Technically Eligible to Serve if Elected*, The Baltimore Sun

---

[7] The court did not make an explicit finding of irreparable harm to Appellees, although its statement on the balance of harms factor may have implicitly included such a finding.

[8] This Court appreciates the excellent written and oral presentations by both sides on the important issues in this case on an extremely compressed timetable.

(Jun. 13, 2018), *available at* http://www.baltimoresun.com/news/maryland/politics/bs-md-oaks-registers-to-vote-20180612-story.html. (last visited July 18, 2018).[9]

Voting in the primary election took place during the early voting period of June 14 through June 22 and on primary election day, June 26, 2018. Mr. Oaks did not garner sufficient votes to be the State Senate nominee in the 41st District or to gain a position on the Democratic Central Committee.[10] *See* https://elections.maryland.gov/elections/2018/results/primary/index.html (last visited July 18, 2018).

On July 17, 2018, the federal district court sentenced Mr. Oaks to 42 months imprisonment followed by three years of supervised release, a $30,000 fine, and 80 hours community service. He was required to begin serving his prison sentence in September 2018. Luke Broadwater, *Former Maryland Senator Oaks Sentenced to 3½ Years in Prison for Corruption Charges*, The Baltimore Sun (July 17, 2018), *available at* http://www.baltimoresun.com/news/maryland/politics/bs-md-oaks-sentencing-20180716-story.html (last visited July 18, 2018).

---

[9] Whether Mr. Oaks' re-registration re-qualified him as a candidate, as well as a voter, is not before us and we express no opinion on that issue.

[10] Mr. Oaks received approximately 6.4% of the vote for the State Senate seat. Even if all of the votes for Mr. Oaks were added to those of the second place finisher in the primary, it would not have changed the outcome of that election.

# II

## Discussion

In its appeal, the State Board argued that this action was barred by laches and that, in any event, the Circuit Court erred in granting the motion for a preliminary injunction. We agree that the Appellees failed to satisfy the requirements for the issuance of an injunction and, accordingly, do not address the laches argument.

### A.    *Standard of Review*

To decide a motion for a preliminary injunction, a trial court must consider four factors:  (1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance of convenience" – *i.e.*, consideration of the harm to the defendant if the court issues an injunction weighed against the harm to the plaintiff if the court does not; (3) whether the plaintiff will suffer irreparable injury; and (4) whether an injunction serves the public interest. *Ehrlich v. Perez*, 394 Md. 691, 708 (2006).  Unless a court concludes that all four factors weigh in the plaintiff's favor, the court may not grant the preliminary injunction. *Id.*

Generally, an appellate court reviews the grant of a preliminary injunction for abuse of discretion, as assessment of the factors will relate to the particular facts of the case.  394 Md. at 707.  However, the trial court must consider those factors in accordance with correct legal standards, and an appellate court reviews the trial court's resolution of a question of law without deference to the trial court.  *Id.* at 708.

In this case, we shall focus on the first of the four factors – the Appellees' likelihood of success on the merits. With regard to that factor, the party seeking the injunction must

show a real probability of prevailing on the merits, not merely a remote possibility of doing so.  394 Md. at 708.  The relevant facts here are undisputed and thus the likelihood of the Appellees' success on the merits turned on a question of law.  Accordingly, we review the Circuit Court's decision of that issue without deference.

**B.** ***Whether Appellees Were Likely to Succeed on the Merits of Their Claim***

To prevail on their claim under EL §12-202, the Appellees had to establish that the presence of Mr. Oaks' name on the primary election ballot:  (1) was inconsistent with the laws applicable to the election process, and (2) might change the outcome of the election.

In our view, on the facts before the Circuit Court, there was no likelihood that the Appellees could establish the first element of their claim.  As outlined earlier, the State Board acted consistently with the Election Law Article and applied it precisely in including Mr. Oaks' name on the primary election ballot.  The Appellees do not appear to dispute the State Board followed the statutory provisions.  Instead, the Appellees argue that the State Board had leeway not to do so and, in fact, was required to depart from the statute.

The Appellees' argument has two prongs.  First, they argue that the deadlines in the Election Law Article for removing a name from the ballot may be disregarded because the statutory provisions are directory rather than mandatory.  Second, they assert that, even if the statutory provisions directing that a candidate's name remain on the ballot are mandatory, the State Board's failure to deviate from that directive violated the federal and State constitutions.

15

1.      Mandatory versus Directory

The question as to whether EL §5-504(b) and §5-601 are mandatory or directory is an issue of statutory construction. As always with statutory construction, we discern legislative intent by starting with the text of the statute, by checking the legislative history to confirm conclusions or resolve questions, and by considering the consequences of alternative readings of the text in order to avoid illogical or nonsensical interpretations. *See Blue v. Prince George's County*, 434 Md. 681, 689 (2013).

*Text in Context*

There is no dispute that Mr. Oaks failed to withdraw his certificate of candidacy by the deadline for doing so (March 1) and that he was not disqualified as a candidate by the deadline for removing candidates whose disqualification is known to the election board (March 9). As outlined above, in those circumstances, the text of the pertinent statutes is unambiguous – the candidate's name "shall appear" and "shall remain" on the ballot. EL §5-504(b) (candidate's name "shall appear on the primary election ballot"); EL §5-601 (the candidate's name "shall remain on the ballot").

It is generally presumed that the use of the word "shall" by the Legislature denotes a mandatory obligation. *See State v. Rice*, 447 Md. 594, 626 (2016) ("Absent any other indication that the context requires a different interpretation, we will not depart from our practice of interpreting the word 'shall' as mandatory."); *Walzer v. Osborne*, 395 Md. 563, 580 (2006) ("When a legislative body commands that something must be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done

16

in the manner it directed.") (editorial marks and citations omitted). In some instances, however, the context of a statute may indicate that the General Assembly intended for a provision using the term "shall" to be directory. *See Maryland State Bar Ass'n, Inc. v. Frank*, 272 Md. 528, 532-33 (1974).

The Appellees observe that there is no penalty in the statute if the State Board were to remove the name of a candidate who belatedly asks to withdraw a candidacy or whose disqualification becomes known after the deadline. They suggest that the lack of a penalty means that these provisions are directory and that State Board has the discretion to remove names from the ballot after the deadline. However, the absence of a statutory penalty is not dispositive as to whether "shall" is mandatory. *Rice*, 447 Md. at 625. Moreover, it is difficult to imagine what penalty the Legislature could have written into the statute to penalize the State Board for ignoring statutory deadlines.

In this instance, there is nothing in the context of the statute that suggests that the State Board has discretion to remove a name from the ballot that the statute says "shall appear" and "shall remain" on that ballot. Indeed, the sequence of deadlines in the statute demonstrates that the General Assembly contemplated the possibility that a person who filed a certificate of candidacy might have a change of mind after doing so and provided a window for the person to reverse course. Similarly, the Legislature also contemplated that a person, regardless of a continuing desire to run for office, might die or become disqualified after the withdrawal deadline, and expressly provided another window of time in which the State Board could correct the ballots in those circumstances – 10 days after the filing deadline. These deadlines were undoubtedly designed to provide some finality

17

to facilitate compliance with other statutory deadlines in federal and State election law, such as the deadline for overseas ballots. The statutory context thus reinforces the plain meaning of the text.

The interpretation that such filing deadlines in the election law are mandatory and that election officials lack discretion to deviate from those deadlines has been reiterated on several occasions by this Court. *E.g.*, *Andrews v. Secretary of State*, 235 Md. 106, 108 (1964) ("[W]here the election statutes fix a date for filing petitions or certificates of candidacy, such documents must be filed before the expiration of the time fixed, and that the election officials may not exercise any discretion in the matter") (citations omitted).

*Legislative History*

An examination of the statute's legislative history supports the conclusion that EL §5-504(b) and §5-601 allow the State Board no discretion to remove names from the primary election ballot after the relevant deadlines have passed.

In 1966, this Court ruled, consistent with prior case law, that the filing and withdrawal deadlines in the State election law, then codified in former Article 33, §§56, 73 of the Maryland Code, were "mandatory and [left] no discretion in either the election officials or the court." *McGinnis v. Board of Supervisors of Elections*, 244 Md. 65, 68 (1966).[11] One year later, the Legislature comprehensively revised the State election law,

---

[11] Appellees point to an earlier decision of the Court in *Black v. Board of Supervisors of Elections,* 232 Md. 74 (1963), in which this Court affirmed a lower court decision that allowed a candidate nominated for Baltimore City Comptroller in a primary election to step aside in favor of another candidate after the statutory withdrawal date. In reaching that decision, the Court observed that an individual has a right to resign as a candidate and have one's name removed from the ballot "in the absence of a statutory prohibition." 232 Md.

recodified the provisions concerning filing certificates of candidacy and withdrawing candidacy in new sections (former Article 33, §§4A-3 and 9-1), and included an express statement in the new withdrawal section stating that the deadlines were mandatory. Chapter 392, Laws of Maryland 1967.

Thirty years later, in 1996, the Legislature created the Commission to Revise the Election Code, known colloquially by the name of its chair as the Garber Commission, to undertake another comprehensive revision of the State election law. The Commission issued a report the following year that recommended various substantive changes in that law. *See* Report of the Commission to Revise the Election Code (December 1997). While the Commission recommended a minor change in the deadline for removing a name from the primary election ballot, it did not recommend any change concerning the mandatory nature of the filing and withdrawal deadlines for candidates. *Id*. at 54-55.

Based on the Commission's recommendations, in 1998, the Legislature enacted a comprehensive revision of former Article 33. Chapter 585, Laws of Maryland 1998. The provisions of former Article 33, §9-1 concerning the withdrawal of a candidate were

---

at 79. While the Court noted that time limitations on withdrawal of a candidacy in some other states have been held to be directory, it explicitly declined to base its decision on that ground. *Id*. at 80. Rather, the Court determined that the general statutory withdrawal deadline at issue could not apply at all in the context of the case before it because the deadline for withdrawal of a candidate from a general election occurred *before* the statutory date for the municipal primary at which an individual would be nominated as a candidate for Comptroller in the general election. The Court held that the withdrawal deadline was "inapplicable in a case where it clearly cannot apply." *Id.*

rewritten and divided among various sections of the revised article. *See* former Article 33, §5-501 *et seq.*, §5-601 (1997 Repl. Vol., 1998 Supp.).[12]

Pertinent to this case, former Article 33, §9-1(b)(3) stated that the name of a person who filed a certificate of candidacy, was opposed, and did not withdraw "shall appear" on the primary election ballot. In the 1998 law, this provision was recodified as former Article 33, §5-504(b), which was later carried over to the Election Law Article with the same codification and without substantive change.

Former Article 33, § 9-1(b)(1) set forth the process and deadline for withdrawing a candidacy in a primary election and stated that the name of a person who withdrew "shall not be printed" on the primary election ballot. In the 1998 law, this provision was recodified as former Article 33, §5-504(a)(2), which provided that the name of a candidate who withdrew "may not be submitted to the voters." That provision was later carried over to the Election Law Article with the same codification and without substantive change.

Former Article 33, §9-1(a) stated that the withdrawal deadline was mandatory – in other words, a candidate who missed the withdrawal deadline had not withdrawn and therefore the direction in §9-1(b)(1) not to print the name on the ballot did not apply. The effect of §9-1(a) was carried over in the 1998 law in Article 33, §5-601 which converted what would be a double negative into an affirmative statement – the name of such a

---

[12] As originally enacted, the statute set a withdrawal deadline "prior to" a filing deadline. This was corrected the following year in the Legislature's Annual Corrective Bill by substituting "after" for "prior to." Chapter 34, §1, Laws of Maryland 1999.

candidate "shall remain" on the ballot. Like §5-504, §5-601 was carried over to the Election law Article with the same language and without substantive change.

It thus appears that §5-504(b) and §5-601 were intended to incorporate the mandatory nature of the withdrawal deadlines recognized in *McGinnis* and prior cases and in the 1967 revision of the election law. As noted above, those provisions were carried over with the same codification, without substantive change, in the new Election Law Article in 2002. Chapter 291, Laws of Maryland 2002. In all respects pertinent to this case, they remain unchanged since that time.

Thus, the legislative history of the State election law demonstrates that the withdrawal deadlines have long been considered mandatory and there is no indication that the General Assembly intended to confer discretion on the State Board to ignore them.[13]

*Consequences*

Under the Appellees' interpretation of the statutory language, the State Board would have discretion to decide whether to remove a candidate's name from the ballot if the candidate belatedly requests removal, becomes disqualified, or (as in Mr. Oaks' case) arranges his own disqualification by relinquishing voter registration. That interpretation invites a score of related questions. For example, in this case, Appellees sought the removal of Mr. Oaks' name from the ballot while he was still qualified as a voter and candidate.

---

[13] The Garber Commission Report stated that one of the purposes of reorganizing election laws was to enhance the effectiveness of the State Board, stating that its "grant of authority and its responsibilities should be clearly defined." Garber Commission Report, at 2. In our view, it is unlikely the Legislature would have granted such broad discretion to the State Board without clearly defining it, much less mentioning it.

According to the record in this case, 10 other presumably qualified candidates also asked to be removed from the primary ballot after the deadline for doing so. Which of these would the State Board forgive for missing the deadline? And how would it decide? How late would the State Board have discretion to deviate from the deadline? One week? Two weeks? Or (as in the case of Mr. Oaks) seven weeks after the withdrawal deadline and just two weeks before overseas ballots are to be sent out? Should the State Board remove a name from the ballot if it, or someone else, anticipates the future disqualification of a candidate sometime after the statutory deadline? How certain must the future disqualification be? Does it matter whether the candidate acquiesces or opposes the effort? The statute provides no answers – in our view, because the General Assembly did not intend to confer on the State Board the discretion to remove a name from the ballot contrary to the directive of the statute.

The Appellees propose that "likelihood of confusion" should be the State Board's benchmark when deciding whether to remove a name that the statute says "shall remain" on the ballot. At oral argument, Appellees suggested that, if a candidate who wishes to belatedly withdraw, or who is belatedly disqualified, is well known, then the candidate's presence on the ballot is more likely to confuse voters, and the name should be removed from the ballot. In our view, such a standard calls for the sort of subjective judgment that is antithetical to the even-handed role that the State Board must play. What neutral, objective measure of notoriety should it consult? Google hits? Twitter followers? Number of failed or successful bids for office? If it looks to any of those metrics, what is the cut-off for deviating from the statute? Again, there is no direction in the statute from the

22

Legislature on how to exercise such discretion – another clue that the General Assembly did not intend to confer it.

Finally, Appellees assert that a consequence of interpreting the statutes as mandatory would be to render them unconstitutional. Appellees urge us to apply the canon of constitutional avoidance to construe the text of the statute as directory rather than mandatory. Under the canon of constitutional avoidance, if a legislative act is susceptible to two interpretations – one constitutional and the other potentially not – a court will opt for the constitutional interpretation rather than invalidate the statute. *See Koshko v. Haining*, 398 Md. 404, 425-26 (2007); *G. Heileman Brewing Co. v. Stroh Brewery Co.*, 308 Md. 746, 763 (1987). However, as indicated in the next section of this opinion, construing these provisions as mandatory does not render them unconstitutional. Thus, there is no need to find them directory to rescue them from a constitutional challenge.

*Summary*

The plain language of the statute, read in context, and confirmed by its legislative history, manifests that the directives in EL §§5-504(b) and 5-601 concerning ballot content are mandatory. Thus, the State Board has no discretion to remove the name of a candidate that those provisions state "shall appear" and "shall remain" on the primary election ballot. To hold otherwise would be contrary to the statute's plain language, and would delegate unspecified discretion to the State Board to remove names from a primary election ballot without direction from the Legislature as to when to do so.

The Appellees characterize this requirement as "inflexible," but we give "judicial deference to the policy decisions enacted by the General Assembly." *Phillips v. State*, 451

23

Md. 180, 196 (2017).  It was up to the Legislature to weigh the consequences of a deceased or otherwise disqualified candidate appearing on the ballot against the need to prepare and print the ballots in a timely manner for the primary election.  It has done so here, and it did not give the State Board discretion to deviate from that balance.[14]

### 2.    Constitutionality of EL §5-504 and §5-601 as Applied

The Appellees' constitutional argument appears to be an "as applied" challenge to these provisions of the election law.  In an "as applied" challenge, the challenger claims "that a statute is unconstitutional on the facts of a particular case or in its application to a particular party."  *Motor Vehicle Administration v. Seenath*, 448 Md. 145, 181 (2016) (quoting Black's Law Dictionary (10th ed. 2014)).  The Appellees argue that, while EL §5-504 and §5-601 may be constitutional on their face, they violate the federal and State constitutions when applied to retain Mr. Oaks' name on the primary election ballot.

Appellees rely specifically on the First and Fourteenth Amendments of the federal Constitution and Articles 7 and 24 of the Maryland Declaration of Rights.  State laws concerning the appearance of a candidate on a ballot may implicate the freedom of association guaranteed by the First Amendment, which is also "an inseparable aspect of the 'liberty' assured by the Due Process Clause" of the Fourteenth Amendment.  *Anderson*

---

[14] The election law is generally explicit when it confers discretion.  An instructive comparison is EL §5-1204, which expressly requires the State Board to consult with the local board of elections and consider whether there is sufficient time to revise a ballot when the election law provides for a vacancy in a candidacy to be filled.  The premise in that situation is that the vacancy was "properly filled and certified … within the time prescribed" in the statute.

*v. Celebrezze*, 460 U.S. 780, 787-88 (1983) (citation omitted). Article 7 of the Maryland Declaration of Rights guarantees "free and frequent elections" and provides the "right of suffrage" to citizens with constitutional qualifications. Article 24 of the Maryland Declaration of Rights incorporates guarantees of due process and equal protection similar to those in the federal Constitution. *See, e.g., Frey v. Comptroller*, 422 Md. 111, 176 (2011); *Widgeon v. Eastern Shore Hospital Center*, 300 Md. 520, 532 (1984).

An initial step in the analysis of Appellees' constitutional argument is to determine what level of review applies. To do so, a court considers first "the extent and nature of the burden placed upon voters by the provision or practice in question." *Burruss v. Board of County Commissioners of Frederick County*, 427 Md. 231, 253 (2012); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992). As the Supreme Court has recognized, every election law impacts voter choice to some extent, but "to subject every voting regulation to strict scrutiny … would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. The rigorousness of the inquiry thus depends on the extent to which voter rights are burdened. *Id.* at 434. When restrictions are "severe," strict scrutiny applies and they must be narrowly drawn to advance a compelling state interest. *Id.* When the impact of an election law is "minimal," the rational basis test applies. *Id.*

The Appellees urge us to apply strict scrutiny because the provisions in this case "impact voter choice." Appellees argue that the appearance of Mr. Oaks' name on the ballot would cause confusion as to his qualification to serve. They reason that, because Mr. Oaks was at least temporarily disqualified from serving in elective office by giving up

25

his voter registration prior to the primary election (and was likely to be disqualified in any event by virtue of serving a future prison sentence after the primary election), any vote cast for him would be "wasted," disenfranchising the voter who cast the vote.[15] In Appellees' view, because EL §5-504(b) and §5-601 retained Mr. Oaks' name on the ballot, those provisions were responsible for any such disenfranchisement.

Appellees are correct that EL §§5-504 and 5-601 dictate which candidates appear and remain on the primary election ballot and thus affect the universe of candidates from which voters may readily choose from the ballot. There is some potential for confusion any time a deadline is missed and the name of a reluctant candidate or a disqualified or deceased person appears on the ballot. However, it does not follow that strict scrutiny applies. The burden EL §§5-504 and 5-601 impose on voters is minimal. The fact that the ballot contains the name of a person who was a qualified candidate as of the cut-off date, but later died, belatedly decided against running, or became disqualified, does not prevent any voter from voting for another candidate of the voter's choice who appears on the ballot.

---

[15] The premise of the argument does not seem entirely accurate. As one member of the Court noted at oral argument, a voter with full knowledge of Mr. Oaks' disqualification might still choose to vote for him because the voter believed that, whatever his misdeeds, he was still the best candidate, or because the voter wished to cast a protest vote. A review of the State's voting tallies from the previous two elections reveals that more than 43,000 write-in votes were cast for president in 2016 and more than 4,200 write-in votes were cast for governor in 2014 for candidates that, in many instances, were likely unqualified and whom the voter selected for reasons other than that the candidate was likely to prevail in the election. Indeed, this Court has held that a voter has a right under the Maryland Constitution to cast such a vote. *Jackson v. Norris*, 173 Md. 579, 594-601 (1937).

This case is therefore unlike cases in which candidates were denied *access* to the ballot,[16] and the challenged provisions *restricted* the pool of candidates on the ballot from whom voters could readily choose. As applied in this case, these provisions did not limit candidate access to the ballot or the ability of a voter to select a preferred candidate. Appellees conceded that, while early candidacy *filing* deadlines have sometimes been held unconstitutional when they restrict access to the ballot, they were unable to find a case holding that a *withdrawal* deadline was unconstitutionally early. This should not be surprising, as a withdrawal deadline by itself does not restrict access to the ballot.

Because the burden imposed upon voters by these provisions is relatively minimal, we apply rational basis review. Under rational basis review, "the State's important regulatory interests are generally sufficient to justify the restrictions" imposed by reasonable, nondiscriminatory provisions. *Burdick*, 504 U.S. at 434. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Anderson,* 406 U.S. at 788 (quotation marks and citations omitted); *accord, Nader for President 2004 v. Maryland State Board of Elections 2007*, 399 Md. 681, 708 (2007) ("in order for there to be a fair and honest implementation of the elective franchise, regulations must be in place").

That standard is met in this case. As a practical matter, for there to be "some sort of order rather than chaos," the State Board and local election boards must be able to carry

---

[16] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Board of Supervisors of Elections of Prince George's County v. Goodsell*, 284 Md. 279 (1979).

out their duties according to a reasonable schedule that accommodates the various requirements of State and federal law necessary to conduct a free and fair election. In particular, that schedule must provide sufficient time for the State Board to lay out, certify, format, and print ballots. There must be finality to the content of the ballot. That, in turn, means there must be deadlines – in this case, deadlines for being removed from the ballot. *See Chamberlain v. Board of Sup'rs of Elections of Baltimore County*, 212 Md. 342, 345 (1957) ("It has also been recognized … that the fixing of a deadline is not an unreasonable or unconstitutional restriction, in view of the necessity of making timely preparations for the election").

In Title 5 of the Election Law Article, the General Assembly has specified those deadlines. In conjunction with those deadlines, the Legislature has directed the State Board in EL §§5-504(b) and 5-601 as to which names are to appear on the ballot. The question is: are those deadlines reasonable and nondiscriminatory? With the deadline for delivery of overseas ballots on May 12, the Legislature has set a deadline that allows the State Board approximately two months to review whatever certificates of candidacy have been filed (2,563 this year), organize them according to offices and localities, adjust them for timely withdrawals and known disqualifications, and then go through the process of laying out, certifying, and printing the ballots. Given the multi-step process the State Board must navigate to create the ballots in various styles and formats, and the fact that a late change to the ballots would require the State Board to retrace steps in the process, these provisions

are a reasonable limitation.[17] They are also nondiscriminatory – the deadlines apply equally to all candidates.

The fact that Mr. Oaks chose to file a certificate of candidacy to place his name on the ballot, did not withdraw that candidacy by the deadline for doing so, and chose to give up his voter registration after the deadline for removing his name from the ballot, does not render any of those deadlines, as applied to Mr. Oaks unconstitutionally early.

## III

## Conclusion

We hold that the State Board was required to apply the deadlines set forth in the State election law and follow the statutory directives in composing the 2018 primary election ballot. Those directives were constitutional as applied to retain Mr. Oaks' name on that ballot. Thus, as a matter of law, the Appellees would not have succeeded on the merits of their claim and were not entitled to a preliminary injunction. For that reason, we vacated the preliminary injunction issued by the Circuit Court and remanded the case to that court with direction to dismiss the Appellees' complaint.

---

[17] In its two-page order on April 26, the Circuit Court concluded that the State Board "still has adequate time to reform the ballots," although it made no specific fact findings to explain that conclusion or why it discounted the affidavit submitted by the State Board that revision of the ballots at that point was "not feasible." The court did not hold a hearing on Appellees' motion for reconsideration and may have been relying on testimony from a week earlier, before ballot printing had begun, that a revision would be "challenging" but "doable" as of that earlier date. At that time, the court had declined to halt that ongoing process for creating the ballots.

Circuit Court for Anne Arundel County
Case No. C-02-CV-18-001013
Argued: May 2, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 85

September Term, 2017

_____

LINDA H. LAMONE

v.

NANCY LEWIN, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring Opinion by Getty, J.

_____

Filed: July 31, 2018

Respectfully, I concur.  I agree with the Majority's holding and write only to explain the collateral consequences of the "felon voting rights" reform passed by the Maryland General Assembly and specifically the impact on the filing of certificates of candidacy for public office as they apply in this case.

The Maryland Constitution and Maryland Code contain very few qualifications to run for an office in the state legislature.  To be eligible to serve as a state Senator or Delegate, a person must: (1) be a citizen of Maryland; (2) have resided in Maryland for at least one year by the time of his or her election; and (3) have resided in the district he or she has been chosen to represent for at least six months prior to the date of his or her election.  Md. Const., art. III, § 9.  In addition, the Constitution has an age requirement that "[a] person is eligible to serve as a [state] Senator, if he has attained the age of twenty-five years, or as a [state] Delegate, if he has attained the age of twenty-one years, on the date of his election."  *Id.*

The Constitutional residency requirement is satisfied by an individual's voter registration under the election statute: a candidate must "be a registered voter at an address that satisfies any residence requirement for the office that is imposed by law . . . ."  Maryland Code, Election Law Article ("EL"), § 5-202.  For the purposes of this case, it is important to note that there is no provision in the Constitution or Code that would ban a person previously, or even recently, convicted of an infamous crime or felony from being a candidate for public office in Maryland.

However, in the past, the State Board of Elections ("State Board") had the authority to prohibit the candidacy of a person with a conviction of a serious crime through a

roundabout manner of administering the voter registration laws. The origins of this voter registration disqualification derive from the Maryland Constitution of 1851, which stated that "no person above the age of twenty-one years, convicted of larceny or other infamous crime, unless he shall be pardoned by the Executive, shall ever thereafter be entitled to vote in any election in this State . . . ." 1851 Md. Const., art. I, § 5. This permanent voter registration disqualification carried forward in both the 1864 Constitution and 1867 Constitution with only minor revisions and remained in effect until a Constitutional amendment was ratified in 1972. 1867 Md. Const., art. I, § 2; 1864 Md. Const., art. I, § 2.

In 1967, the Maryland Constitutional Convention Commission reviewed this voter registration disqualification provision and commented that the language of Article 1, Section 2 could be construed as "vague." Constitutional Convention Commission of Maryland, *Report of the Constitutional Convention Commission* 119 (1967). As such, the Commission recommended that the provision be repealed and replaced by language authorizing that the legislature have the "power to designate and define the crimes, conviction of which shall carry the consequence of loss of the right to vote" by statute but also that "disenfranchisement may only be imposed on those convicted of serious crime."[1] *Id.*

Although the proposed new constitution was voted down by Maryland voters in 1968, the General Assembly later considered a separate Constitutional amendment with

---

[1] The Commission substituted "serious" for "infamous" in an attempt to free "the provision of the common law restrictions and connotations that have been attached to the term 'infamous crime.'" *Id.*

similar language that was ratified in 1972. The Constitutional amendment created Article 1, Section 4 of the present Maryland Constitution that authorizes the General Assembly "to regulate or prohibit the right to vote of a person convicted of infamous or other serious crime . . . ." Md. Const., art. I, § 4. Pursuant to this Constitutional amendment, the General Assembly passed Senate Bill 57 in 1974 which provided that "[n]o person shall be registered as a qualified voter if he has been convicted of larceny or other infamous crime, unless he has been pardoned or, in connection with his first such conviction only, he has completed any sentence imposed pursuant to that conviction including any period of probation imposed by virtue of parole or otherwise in lieu of a sentence or part of a sentence." 1974 Md. Laws, ch. 299. Under this provision, first time offenders were given a second bite of the voter registration apple but individuals convicted of a subsequent infamous crime remained unable to vote. *See State v. Broadwater*, 317 Md. 342 (1989).

Beginning in 2002, the General Assembly enacted a series of bills to enact "felon voting rights" reforms.[2] The first reform bill eliminated the repeat offender prohibition and instead mandated that any individual convicted of an infamous crime could have their voter registration restored after completing their entire court-ordered sentence (including probation, parole, community service, restitution, and fines) plus a subsequent three-year period of ineligibility. 2002 Md. Laws, ch. 304, § 1. Significantly, under this language and under the prior statutes and Constitutional provisions dating back to 1851, conviction

---

[2] S.B. 340, 2015 Reg. Sess. (cross-filed as H.B. 980) (vetoed by Governor but the Governor's veto was overridden by the General Assembly during the 2016 legislative session); S.B. 488, 2007 Reg. Sess.; S.B. 184, 2002 Reg. Sess. (cross-filed as H.B. 535).

was the trigger by which the State Board had the authority to revoke one's voter registration and ultimately prevent his or her candidacy on the ballot.

In 2007, that trigger changed from conviction to imprisonment when the General Assembly passed the Voter Registration Protection Act, EL § 1-101, *et. seq.*, which stated that an individual may not qualify to vote if the individual "has been convicted of a felony and is actually serving a court-ordered sentence of imprisonment, including any term of parole or probation, for the conviction." 2007 Md. Laws, ch. 159, §§ 1, 2. In 2016, EL § 3-102(b) was further modified by the removal of the "term of parole or probation." The statute before the Court in this case provides that an individual "is not qualified to be a registered voter if the individual has been convicted of a felony *and is currently serving a court-ordered sentence of imprisonment for the conviction.*" 2016 Md. Laws, ch. 6, § 1 (emphasis added).

While Appellees argued that the State Board could have removed Oaks's name after the statutory deadlines had passed, it is clear, through analysis of the relevant Maryland Constitution and Code provisions found above, that the State Board did not have authority to change Oaks' status as a candidate in the primary election. Although Oaks pled guilty to a felony, Oaks was not "currently serving a court-ordered sentence of imprisonment for the conviction[.]" Under EL § 3-102(b), only when Oakes was imprisoned would his voter registration be revoked. Thus, at the time of his guilty plea, Oaks remained a registered voter eligible under state election laws to serve as a state Senator and to maintain a valid certificate of candidacy for re-election. *See* EL § 5-202.

By this circuitous route, the recent "felon voting rights" reform by the General

4

Assembly provides that anyone can file to run for public office regardless of any past record of convictions for serious crimes as long as they meet the Constitutional requirement of age and residency and are not imprisoned under a felony conviction at the time of filing their certificate of candidacy or at any time prior to Election Day.

I also want to express my agreement with the Majority's analysis of the statutory provisions specifying that a finite timeline is mandated for ballot preparation and review. *See* Maj. Slip Op. at 27–29. The Garber Commission stressed that for the efficient administration of an election, a point of finality was paramount after which the ballot shall not be changed. *See id.* at 19. One of the few substantive changes recommended by the Garber Commission and adopted by the General Assembly in the comprehensive revisions to the election code was to extend the deadline for removing a candidate from the primary ballot due to death or disqualification by three days. Report of the Commission to Revise the Election Code 54 (December 1997); 1998 Md. Laws, ch. 585, § 2. But at that point, ten days after the filing deadline, the finality of the ballot becomes supreme so that the mechanics of having an efficient election process for absentee ballots, early voting and Election Day polling is successful. To require the State Board to make a ballot change upon the voluntary relinquishment of a voter registration, as Oaks did April 23, 2018, would be contrary to the election laws of the state. *See* Maj. Slip. Op. at 27. Moreover, it would create a future loophole eroding the statutory point of finality of the ballot necessary to maintain an efficient election process. The State Board correctly applied the statutory deadlines in this case.

For the above reasons, respectfully, I concur.

Circuit Court for Anne Arundel County
Case No. C-02-CV-18-001013

Argued: May 2, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 85

September Term, 2017

_____

LINDA H. LAMONE

v.

NANCY LEWIN, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by Watts, J., which Hotten,
J., joins.

_____

Filed: July 31, 2018

Respectfully, I dissent. I would have affirmed the decision of the Circuit Court for Anne Arundel County—specifically, the issuance of a preliminary injunction ordering the State Board of Elections ("the State Board") to remove Nathaniel T. Oaks's name from any and all primary election ballots. In this case, the Majority concludes that a candidate's name must remain on the ballot where the candidate had pled guilty to felony offenses in federal court and was awaiting sentencing, and had relinquished his right to vote as a citizen in the State of Maryland. I disagree.

As a threshold matter, from my perspective, this Court should have denied the State Board Administrator's petition for a writ of *certiorari*. This would have left intact the decision of the circuit court in which the circuit court aptly stated: "The harm to the voters by way of potential confusion, inadvertence, and/or mischief by the appearance of a disqualified name on the ballot far outweighs any inconvenience to the Board[.]" As of May 2, 2018, the date of oral argument before this Court, the record demonstrated that the State Board had indicated that removing Oaks's name from the ballot was "doable." Under those circumstances, leaving the circuit court's ruling intact would have been the right thing to do for the voters of Maryland Legislative District 41 in Baltimore City, and for the general integrity of the primary election. Under Md. Code, Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) § 12-203, if this Court "finds that review of the case . . . is desirable and in the public interest," then this Court "shall require by a writ of *certiorari* that the case be certified to it for review and determination." Granting *certiorari* to review the circuit court's issuance of the preliminary injunction was neither desirable nor in the public interest. No one could argue that having Oaks's name on the ballot when he was awaiting

sentencing in federal court and would not have been able to serve as a State Senator after a sentence of incarceration, and when he had relinquished his right to vote, was in the public interest.

That said, in my view, based on the facts and circumstances of the case, there was every likelihood that Nancy Lewin, Elinor Mitchell, and Christopher Ervin (together, "Appellees") could have established all of the elements of their election claim under Md. Code Ann., Elec. Law (2002, 2010 Repl. Vol.) ("EL") § 12-202, and the circuit court properly granted injunctive relief. In discounting the likelihood that Appellees could establish the elements of their claim, the manner in which the Majority frames the issue— "whether the State Board has discretion to deviate from the directives of the Election Law Article concerning the content of a primary election ballot and whether its adherence to those directives violated the State and federal constitutions[,]" Maj. Slip Op. at 1—assumes that the statutes that concern the content of a primary election ballot are the statutes that govern Appellees' complaint. They are not. Indeed, the majority opinion's holding with respect to the applicability of EL §§ 5-601 and 5-504(b) to Appellees' claim is incorrect. EL §§ 5-601 and 5-504(b) pertain only to the responsibilities of, and deadlines for, the applicable board of elections, and do not in any way govern the time period for bringing, or the ability of a registered voter to bring, a claim under EL § 12-202.

The Election Law Article prescribes certain duties and responsibilities of the State Board and local boards of elections, and sets forth deadlines for the State Board and local boards of elections to take certain actions. EL § 5-601(1)(ii) provides in relevant part:

The name of a candidate shall remain on the ballot and be submitted to the

voters at a primary election if: (1) the candidate has filed a certificate of candidacy in accordance with the requirements of [EL] § 5-301 . . . and has satisfied any other requirements of this article relating to the office for which the individual is a candidate, provided the candidate . . . (ii) has not . . . become disqualified, and that fact is known to the applicable board by the deadline prescribed in [EL] § 5-504(b)[.]

(Paragraph breaks omitted).  EL § 5-504(b), in turn, provides:

Except for the offices of Governor and Lieutenant Governor, the name of any individual who files a certificate of candidacy and does not withdraw shall appear on the primary election ballot unless, by the 10th day after the filing deadline specified under § 5-503 . . . , the individual's . . . disqualification is known to the applicable board with which the certificate of candidacy was filed.

And, EL § 5-303(a)(1) states that, "in the year in which the Governor is elected, a certificate of candidacy shall be filed not later than 9 p.m. on the last Tuesday in February in the year in which the primary election will be held[.]"

Thus, under EL §5-303(a)(1), a certificate of candidacy had to be filed by 9 p.m. on Tuesday, February 27, 2018.  And, pursuant to EL § 5-502(a), "an individual who has filed a certificate of candidacy may withdraw the candidacy by filing a certificate of withdrawal within 2 days after the filing date established under [EL] § 5-303[.]"  Accordingly, an individual who filed a certificate of candidacy by the February 27th deadline had the ability to withdraw the certificate of candidacy by March 1, 2018.  Pursuant to EL § 5-504(b), where an individual has filed a certificate of candidacy and has not withdrawn, that individual's name needed to appear on the primary election ballot, unless, by March 9, 2018—ten days after the filing deadline of February 27th—the applicable board of elections knows of the individual's disqualification.  Likewise, under EL § 5-601(1)(ii), a candidate's name needed to remain on the ballot and be submitted to the voters at a primary

- 3 -

election, provided that the applicable board of elections had not learned by March 9th that the candidate had become disqualified. Put simply, it is undisputed that, reading these sections together, the Election Law Article provides that a candidate's name shall remain on the primary election ballot unless the applicable board of elections were to know by March 9th that the candidate had become disqualified.

Although these statutes prescribe the duties and responsibilities of boards of elections with respect to candidates and primary election ballots, the statutory deadlines do not dictate when a registered voter may bring an election claim related to the inclusion of a candidate's name on a primary election ballot. Indeed, otherwise, registered voters would never be able to challenge the qualifications of a candidate, or the act of the applicable board of elections of keeping a candidate's name on the ballot, later than ten days after the filing deadline (here, March 9th). The Election Law Article cannot be read in such a way as to override a registered voter's ability to bring a claim under EL § 12-202. Rather, EL § 5-601(1)(ii) and EL § 5-504(b), and EL § 12-202, must be read harmoniously.

EL § 12-202, concerning judicial challenges to elections, provides, in its entirety:

(a) *In general.*—If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:

(1) is inconsistent with this article or other law applicable to the elections process; and

(2) may change or has changed the outcome of the election.

(b) *Place and time of filing.*—A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:

- 4 -

(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or

(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified.

Here, Appellees expressly brought their claim under EL § 12-202, and it is clear that, pursuant to the dictates of the statute, they were entitled to do so, even though EL § 5-601(1)(ii) and EL § 5-504(b) provide deadlines for the applicable boards of elections concerning inclusion of candidates' names on ballots. Under EL § 12-202(a), Appellees, who are registered voters, sought judicial relief from the State Board's refusal to remove Oaks's name from the primary election ballot—clearly an act or omission relating to an election—on the grounds that the act or omission both was inconsistent with applicable law and could change the outcome of the election. As to the potential to change the outcome of the election, it was clear that, if Oaks's name remained on the ballot, voters could cast their votes for him, even though he was disqualified as a candidate. And, it goes without saying that, if voters cast their vote for Oaks, the disqualified candidate, then there was the potential that those votes could have changed the outcome of the election.[1]

Under EL § 12-202(b)(1), Appellees' complaint was timely. On March 29, 2018,

---

[1]That the primary election results demonstrate that Oaks's name being on the ballot did not, in fact, affect the outcome of the election does not detract from the analysis of Appellees' election claim under EL § 12-202. It would have been impossible to predict the future at the time that the circuit court considered the motion for preliminary injunction. Moreover, EL § 12-202(a)(ii) provides that an election claim need only be brought on the grounds that the act or omission relating to an election "**may** change or has changed the outcome of the election." (Emphasis added).
(Continued...)

- 5 -

Oaks pled guilty in federal court. Within ten days of Oaks's guilty plea, on April 9, 2018, Appellees filed their complaint in the circuit court.[2] In other words, Appellees sought judicial relief within "10 days after the act or omission or the date the act or omission became known to" them. EL § 12-202(b)(1).

The act of keeping Oaks's name on the ballot was inconsistent with applicable law in that, having withdrawn as a registered voter, Oaks was not qualified to be a candidate, *i.e.*, a candidate for election must be a registered voter. The wrinkle in this case is that Oaks's disqualification occurred after the March 9th deadline for the State Board to remove names of candidates known to the State Board to be disqualified. The March 9th deadline established by EL § 5-601(1)(ii) and EL § 5-504(b) clearly prevents the State Board from being aware, *i.e.*, knowing of the disqualification of a candidate, and nonetheless allowing the candidate's name to remain on the ballot. The majority opinion states that "the State Board acted consistently with the Election Law Article and applied it precisely in including [] Oaks' name on the primary election ballot." Maj. Slip Op. at 15. This statement may have been accurate as of March 9th, prior to the filing of Appellees' election claim. Nothing in EL § 5-601(1)(ii) or EL § 5-504(b), however, proscribes a registered voter from bringing a complaint under EL § 12-202(a) to remove the name of a disqualified candidate when the candidate became disqualified after the deadline set by the statutes.

What the State Board—and, by extension, the Majority—fails to take into account

---

[2]Although ten days from March 29, 2018, was April 8, 2018, that day was a Sunday, so the tenth day for purposes of filing would fall on the next day that was not a Saturday, Sunday, or holiday, *i.e.*, Monday, April 9, 2018. See Md. R. 1-203(a)(1).

is that EL § 5-601(1) and EL § 5-504(b) concern the applicable board of elections's duties, responsibilities, and deadlines, and do not affect or otherwise constrain a registered voter's ability to bring a claim under EL § 12-202 where an act or omission relating to an election becomes known to the voter, and he or she files for judicial relief within ten days, which was the case here. Plainly, reading EL § 5-601(1) and EL § 5-504(b) in such a way would render EL § 12-202 meaningless, certainly with respect to a registered voter's ability to challenge inclusion of a candidate's name on a primary election ballot where the candidate becomes disqualified between the tenth day after the deadline for filing a certificate of candidacy and the date of the primary election. In my view, the General Assembly did not intend such a result. EL § 12-202 clearly provides a vehicle by which a registered voter may bring a judicial challenge with respect to a disqualified candidate's inclusion on a primary election ballot, even though the State Board itself is constrained under EL § 5-601(1) and EL § 5-504(b) to keep the candidate's name on the ballot, absent a court order. Obviously, pursuant to a claim under EL § 12-202, a circuit court has the authority to order the State Board to strike a disqualified candidate's name from the ballot—the exact scenario that occurred in this case. This is because, by their plain language, EL § 5-601(1) and EL § 5-504(b) do not pertain to claims by registered voters under EL § 12-202. And, by its plain language, EL § 12-202 does not preclude a registered voter from bringing a claim concerning the inclusion of a disqualified candidate's name on a primary election ballot.

Despite the majority opinion's recitation of "the statute's legislative history[,]" Maj. Slip Op. at 18, it cannot be said that the General Assembly contemplated that primary

- 7 -

election ballots would remain unchanged no matter what happens between statutory deadlines and the date of the primary election. Nor can it be said that the General Assembly intended to limit a registered voter's ability to bring a claim, after the statutory deadlines, challenging the inclusion of a disqualified candidate's name on a ballot. The bottom line is that the circuit court's grant of the motion for preliminary injunction ordering the State Board to remove Oaks's name from any and all ballots for elective office was correct, and I would have affirmed the circuit court's decision.[3]

For the above reasons, respectfully, I dissent.

Judge Hotten has authorized me to state that she joins in this opinion.

---

[3]At oral argument, much was made about the possibility that Oaks could re-register to vote and somehow reactivate his candidacy. This would assume that Oaks's original certificate of candidacy would still apply, and that he would automatically satisfy the filing deadlines necessary to be a valid candidate. The theory that would make Oaks a valid candidate is that a candidate who has become disqualified by reason of no longer being a registered voter can re-register, and thus resume his or her candidacy and be presumed to meet all of the filing requirements, even though his or her voter registration lapsed. Ultimately, on this point, I agree with the Majority that whether Oaks's re-registration re-qualified him to be a valid candidate is not before the Court, see Maj. Slip Op. at 13 n.9, and is of no moment with respect to the issue in this case.